Ray Mitchell WILKERSON, Appellant

v.

The STATE of Texas.

No. PD–1605–04.

Court of Criminal Appeals of Texas.

Oct. 5, 2005.

Barry J. Alford, Fort Worth, for Appellant.

Jeffrey L. Van Horn, First Asst. State's Atty., Austin, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which PRICE, JOHNSON, KEASLER, HERVEY, and HOLCOMB, JJ., joined.

A Child Protective Services (CPS) investigator interviewed appellant about the removal of his three children from the home after appellant and his wife were arrested for injury to a child. The court of appeals held that the trial court committed reversible error in allowing the CPS investigator to testify about appellant's statements made during this custodial interview because the CPS worker did not administer *Miranda* warnings or follow the procedures in article 38.22 of the Texas Code of Criminal Procedure.[1]

We hold that only when a CPS investigator (or other non-law enforcement state agent) is acting in tandem with police to investigate and gather evidence for a criminal prosecution are such warnings required.[2] Here there was no evidence that

---

1. *Wilkerson v. State*, 144 S.W.3d 150 (Tex. App.-Fort Worth 2004).

2. The State Prosecuting Attorney's two grounds for review are as follows:

(1) Is a Child Protective Services investigator who, while in the course of a child abuse investigation, conducts an interview with the subject of a report of child abuse while said subject is in custody, to be considered an agent of law enforcement solely because the subject makes an incriminating statement and that statement is subsequently reported to law enforcement by the CPS investigator?

(2) If a Child Protective Services investigator, while in the course of a child abuse investigation, conducts an interview with the subject of a report of child abuse while said subject is in custody, and the subject makes an incriminating statement that is subsequently reported to law enforcement by the CPS investigator, must the CPS in-

the CPS worker was acting in tandem with police officers when she interviewed appellant. Thus, the trial court did not abuse its discretion in admitting appellant's statements.

## I.

Appellant was charged with injury to a child for causing serious bodily injury to his three-year-old son, Andrew, by putting him in a tub of scalding water. He was also charged with causing bodily injury to his five-year-old son, Brydon, by hitting him with a belt.

At trial, Officer John Shelton of the Crowley Police Department testified that he was dispatched to investigate a complaint of injury to a child at appellant's apartment. He found three-year-old Andrew lying in bed. His buttocks were severely burned, and his feet were so burned that the "skin was webbed together like a fin." Officer Sheldon called paramedics who flew Andrew to Parkland Hospital on an ambulance helicopter. Appellant's wife[3] told the officer that Andrew had been burned three days earlier, on February 7, 2002, and that she and appellant had treated the burns with menthol shaving cream.

Later that day, appellant and his wife went to the home of their neighbor, De-Wayne Marshall, a Tarrant County deputy. Deputy Marshall and members of his church had befriended appellant's family when it moved into a nearby apartment three months earlier. Appellant's wife was crying, and she looked scared. Appellant, at the deputy's urging, said that Andrew had been taken to Parkland Hospital in Dallas and explained, "I lost my temper because I'm under a lot of pressure ... [S]o I got a bathtub full of hot water, and ... I put him down in it to teach him a lesson." Deputy Marshall told appellant that he needed to tell the Dallas police exactly what had happened, and he gave appellant ten dollars for gas. Shortly thereafter, appellant, his wife, and the three other children—Daniel, Curtis, and Brydon—returned to their apartment by car. Crowley police officers approached and arrested both appellant and his wife. The three children were taken to a foster home.

The next day, CPS investigator Deanna Lane–Martines met with appellant at the Crowley jail, where he was being held following his arrest for injury to a child. She needed to discuss the children's placement in a foster home because there were no other parents or family members to care for them. At trial, she testified about her legal duties under the Texas Family Code: "Once children are removed [from the home], we have—once we interviewed the children, we have to notify the parents, speak to the parents, interview them within a 24–hour period." First, she and a co-worker interviewed Brydon, Curtis, and Daniel.[4] When she interviewed Brydon at school that morning, she took pictures of marks on his buttocks and thighs. Next, she interviewed appellant and asked him about the marks on Brydon.

vestigator always have provided to the subject admonishments pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Vernon's Ann. C.C.P. art. 38.22, before the incriminating statement made by the subject will be admissible into evidence?

3. Appellant's wife, Sandralyn, was the mother of ten-year-old Daniel. Appellant was the fa-

ther of Curtis, age six, Brydon, age five, and Andrew, age three. It was a second marriage for both appellant and Sandralyn.

4. Later that day Ms. Lane–Martines went to Parkland Hospital to interview Andrew, but, because of his medical condition, she was not able to talk to him.

At this point during the trial, appellant objected to Ms. Lane–Martines's testimony,[5] but the judge overruled the objection and admitted the testimony. Appellant told Ms. Lane–Martines that he had spanked Brydon several times on February 7th for soiling his pants.

The jury convicted appellant of causing serious bodily injury to Andrew and causing bodily injury to Brydon. It assessed his punishment at thirty years' imprisonment on the first charge and ten years' probation on the second. On appeal, the court of appeals affirmed appellant's conviction and sentence on the first case, but it reversed his conviction for injuring Brydon and remanded that case for a new trial. The court reasoned that when a defendant moves to suppress a statement,[6] the burden shifts to the State to show that the proper constitutional and statutory warnings were given.[7] We assume, however, that the court meant that the burden shifts *if* the defendant proves facts that would support a finding that the interrogator is an agent of the state. According to the court of appeals, the State failed to meet this burden, and therefore the trial court erred in overruling appellant's oral motion to suppress the statement.[8]

The court of appeals's published opinion in this case appears to be in conflict with several recent unpublished opinions from

5. Appellant's entire trial objection and voir dire questioning of Ms. Lane–Martines was as follows:

State: What did the defendant tell you happened to Brydon?

Defense: I'll object, Your Honor. Let me ask her a few questions on voir dire.

Court: To perfect your objection?

Defense: Yes, Your Honor.

Court: Go ahead.

By the defense:

Q: Are you employed by a state agency?

A: Yes.

Q: Do you take reports from defendants that are forwarded to the police agencies?

A: I don't understand the question.

Q: Reports–

A: Could you repeat it.

Q: If you question a defendant and make documentation of what they tell you, are those reports forwarded by duty of law to police agencies?

A: Yes, sir.

Q: Do those reports sometimes result in the arrest of people?

A: Based on my report?

Q: Yes.

A: If a report is made to the police, I don't believe they arrest them based on my report. A report can be made to the police about a certain incident, and they would investigate it, and an arrest would be made based on their investigation, not on mine.

Defense: Your Honor, I still object based on the fact she is employed by a state agency, she questions defendants about what crimes that could occur against children, and she turns those questions over to law enforcement agencies that become parts of their files and are used to result in the arrest of citizens on charges.

Court: The objection is overruled.

6. The court of appeals categorized appellant's trial objection quoted above as an oral motion to suppress.

7. 144 S.W.3d at 152.

8. The court of appeals stated:

When a defendant moves to suppress a statement, the burden shifts to the State to show that the proper warnings were given. Appellant proved that

• Lane–Martines interrogated him about his culpability concerning the instant offense in the Crowley jail with no attorney present;

• he was incarcerated for the instant offense at the time;

• she was employed by a state agency;

• she knew when she went to the jail to interview Appellant that, when she questioned a defendant and made documentation of what he told her, the report of the questioning would be forwarded by duty of law to the police agencies;

• she turned over the results of her interrogation to the Crowley police; and that information was used as a basis for prosecuting Appellant.

144 S.W.3d at 152 (footnote omitted).

two other Texas courts of appeals.[9] We do not normally refer to or rely on unpublished opinions for their precedential value, but these opinions state that the law in this area is "well settled," [10] thus implying that publication was unnecessary. Given the conflict in applying our precedent, this area of law may not be entirely clear. Thus, we take this opportunity to provide guidance for the bench and bar on the important legal question: To what extent do the statutory requirements that a CPS worker report her independent investigation results to police make her a police surrogate for purposes of *Miranda* warnings when the person she interviews is in custody?

## II.

■ The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself ..." In *Miranda v. Arizona*,[11] the Supreme Court held that the State may not use any statements stemming from "custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." [12] The Court specifically defined "custodial interrogation" as "questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [13] The Court concluded

**9.** *Rodriguez v. State,* No. 04–02–00615–CR, 2003 WL 21018395, at *1, 2003 Tex.App. LEXIS 3911 * 2 (Tex.App.-San Antonio 2003, no pet.) (unwarned statement to CPS officer admissible; "the record establishes that when [CPS worker] spoke with Rodriguez she was engaged in conducting a child abuse investigation, and any incriminating responses she elicited were exclusively for a legitimate purpose other than law enforcement.... [CPS worker explained that she spoke with defendant] based on DPRS protocol that required her to visit with both parents, explain the process of the DPRS investigation, and alert Rodriguez as to what DPRS would be trying to do to help the family through the situation"); *Carter v. State,* No. 05–00–01215–CR, 2001 WL 1466174, at *2, 2001 Tex.App. LEXIS 7746 *4–9 (Tex.App.-Dallas 2001, no pet.) (unwarned statements made during jailhouse interview with CPS worker admissible; worker met with police officer before interview to determine a "case plan" for interviewing the children only once; officer never told her to interview defendant; she was following standard CPS procedure which "requires an investigator to interview the principals in a case, including an alleged perpetrator"; she told defendant that she was investigating family abuse or neglect and would share information with police, but that she was not a police officer; court finds that interview was not "a custodial interrogation in violation of *Miranda* and the Fifth Amendment"); *Cordova v. State,* No. 05–00–01320–CR, 2001 WL

789290, at *2, 2001 Tex.App. LEXIS 4733 * 5–6 (Tex.App.-Dallas 2001, no pet.) (jailhouse interview by CPS officer did not require *Miranda* warnings; defendant failed to prove agency relationship between police and CPS worker who "testified it was the practice of the police department to refer child abuse cases to CPS. Her job as a CPS worker was to interview persons accused of child abuse .... [but] the police were not involved in [her] investigation. They never asked her to get any information from appellant, did not ask her to assist them in their criminal investigation, nor did they instruct her what to do when she interviewed appellant"; CPS worker testified that she interviewed defendant to "carry out her responsibilities as a CPS officer, not for police department purposes").

**10.** *Rodriguez,* 2003 WL 21018395, at *1, 2003 Tex.App. LEXIS 3911 * 1 ("Because the issues in this appeal are settled by existing precedent, we affirm ... in this memorandum opinion"); *Carter v. State,* 2001 WL 1466174, at *1, 2001 Tex.App. LEXIS 7746 * 1–2 ("Because all dispositive issues are clearly settled in law, we issue this memorandum opinion ...").

**11.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**12.** *Id.* at 444, 86 S.Ct. 1602.

**13.** *Id.* (emphasis added).

that compulsion is "inherent in custodial surroundings," therefore special safeguards are required in the case of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." [14] The Supreme Court recognized that there is a unique danger of coercion in the police-arrestee relationship.[15] Thus, the *Miranda* rule is intended to guard "against coercive custodial questioning by police; it protects a suspect from the possibility of physical or psychological 'third degree' procedures." [16]

 Of course, *Miranda* does not apply to all custodial questioning. It generally applies only to questioning by law enforcement officers or their agents.[17] There are two types of "state agents": all

14. *Id.* at 445 & 458, 86 S.Ct. 1602. Article 38.22 of the Code of Criminal Procedure requires a slightly more elaborate set of warnings than *Miranda* and adds the requirements of either a written, signed statement or an audio or video recording of custodial interrogations by law enforcement. Tex.Code Crim. Proc. art. 38.22.

15. *Id.* at 467, 86 S.Ct. 1602 ("without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"); *see also Beckwith v. United States*, 425 U.S. 341, 345–46 & n. 7, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (reiterating that the *Miranda* "Court gave great weight to contemporaneous police manuals and concluded that custodial interrogation was 'psychologically ... oriented,' and that the principal psychological factor contributing to successful interrogation was isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner' ") (citations omitted). Like the Supreme Court, this Court has recognized that custodial interrogation by law enforcement agents may be inherently coercive. *See Cobb v. State*, 85 S.W.3d 258, 262–63 (Tex.Crim.App.2002).

16. *Cobb*, 85 S.W.3d at 263; *see also Doescher v. State*, 578 S.W.2d 385, 391, n. 6 (Tex.Crim. App.1978) ("the purpose for the prophylactic measures mandated by *Miranda* was to mitigate the inherent coerciveness of station house interrogations").

17. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Mathis v. United States*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), are often cited as two possible exceptions to this rule. In *Smith*, the Supreme Court held that the defendant's *non-Mirandized* custodial statements to a court-appointed psychiatrist who interviewed the defendant in jail to determine his mental competency could not be used against him during the punishment phase of a capital murder trial to prove future dangerousness. *Id.* at 466–67, 101 S.Ct. 1866. The Court noted the unfairness of using the results of a "compelled" interview with a purportedly "neutral" expert designated by the trial court as evidence to prove his future dangerousness. "When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty stage on the crucial issue of [defendant's] future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.* at 467, 101 S.Ct. 1866. In essence, an agent of the trial judge, himself a state agent, was used to collect incriminating evidence for the prosecution.

Similarly, in *Mathis*, the Supreme Court held that an IRS tax investigator who interviewed the defendant in a state prison about his tax returns and—significantly—asked the defendant to sign a waiver of the statute of limitations on his tax returns, was "investigating" and collecting evidence against the defendant for a future legal proceeding while the defendant was "in custody." 391 U.S. at 2–4 & n. 2, 88 S.Ct. 1503.

While neither of these two cases fit neatly into the normal *Miranda* "custodial interrogation by an agent of law enforcement" model, they are both premised upon the fact that the primary purpose of the state-agent interviewer was the collection of evidence to be used against the interviewee in a criminal prosecution. *See* 2 W. LaFave & J. Isreal, Criminal Procedure § 6.10(c) at 623–24 (1991 Supp.).

those who are employed by any state agency are, by definition, "state agents," but only those who are working for or on behalf of police are law-enforcement "state agents." Although state employment clearly makes a person an "agent of the State," that label does not, by itself, make the person an "agent of the State" for the purpose of defining "custodial interrogation." [18] Not all government workers must be familiar with and ready to administer *Miranda* warnings or comply with the procedural requirements of Article 38.22. As noted by Professor LaFave, when "the official has not been given police powers, *Miranda* has been held inapplicable to questioning by school officials, welfare investigators, medical personnel, prison counselors, and parole or probation officers." [19]

Our law recognizes that different types of state employees serve different roles. It is law enforcement's job to ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible prosecution. In pursuing this legitimate goal, the police might be tempted to use physical coercion or other illegitimate methods to gather a confession. The Supreme Court was concerned with this particular power imbalance and the resulting inherently coercive interactions when it devised the *Miranda* warnings. [20]

Child Protective Services (CPS) workers, on the other hand, have a very different set of goals and responsibilities. Their mission is to protect the welfare and safety of children in the community. [21] Although this duty may at times entail the investigation of child abuse claims, that alone does not transform CPS workers into law enforcement officers or their agents. [22] Nor does the fact a CPS worker is statutorily required to report suspected child abuse to law enforcement authorities transform a CPS worker into an agent of law enforcement. All citizens are statutorily required to report suspected child abuse to the authorities. [23] If the obligation to report sus-

---

**18.** *Paez v. State,* 681 S.W.2d 34, 37 (Tex.Crim. App.1984); *see also Cates v. State,* 776 S.W.2d 170, 172 (Tex.Crim.App.1989).

**19.** 2 W. LaFave, § 6.10(c) at 622.

**20.** *See Dickerson v. United States,* 530 U.S. 428, 434–35, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In *Dickerson,* the Court reaffirmed *Miranda* and reiterated its concerns:

> In *Miranda,* we noted that the advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by coercion. Because custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that "even without employing brutality, the 'third degree' or [other] specific stratagems, ... custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." We concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself." Accordingly, we laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow."

> *Id.* (citations omitted; footnote omitted).

**21.** *See* Tex. Fam.Code § 264.002(a) (stating that the Department of Protective Regulatory Services–CPS–shall "(1) promote the enforcement of all laws for the protection of abused and neglected children; and (2) take the initiative in all matters involving the interests of children where adequate provision has not already been made").

**22.** *See Cates,* 776 S.W.2d at 172; *Garza v. State,* 18 S.W.3d 813, 825 (Tex.App.-Fort Worth 2000, pet. ref'd).

**23.** Tex. Fam.Code § 261.101. That section reads:

> (a) A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter.

pected child abuse by itself could convert a CPS worker into a law enforcement agent, then every person who suspects child abuse could be called a "law enforcement agent" in the *Miranda* context. This is clearly not the law, and it was certainly not the purpose of the prophylactic *Miranda* warnings.

■ For the most part, CPS caseworkers, who are investigating family placement and safety matters, and police officers, who are investigating criminal matters, run on separate parallel paths. Both are interested in gathering information. While police are collecting information for an arrest and criminal prosecution, CPS workers are investigating to find safe housing and protection for abused or neglected children. When a state-agency employee is working on a path parallel to, yet separate from, the police, *Miranda* warnings are not required.[24]

■ On the other hand, if the once-parallel paths of CPS and the police converge, and police and state agent are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be necessary.[25] At this point, a CPS worker may be viewed as an agent of the police. The term "agency" denotes a consensual relationship which exists between two persons or parties where one of them is acting for or on behalf of the other.[26] The law does not, however, presume an agency relationship. The person alleging such a relationship has the burden of proving it.[27] But if a defendant does prove that a particular person—whether CPS caseworker, teacher, preacher, probation officer, or mere family friend—is, in fact, working for or on behalf

---

24. *Paez v. State*, 681 S.W.2d at 37–38; *Davis v. State*, 687 S.W.2d 78, 81 (Tex.App.-Dallas 1985, pet. ref'd). For example, in *Paez*, a CPS investigator interviewed the defendant, who was in custody for the murder of her husband, to determine the proper placement of her children. 681 S.W.2d at 36. This Court held that the CPS worker was not acting as an agent of law enforcement pursuant to a police practice because the record did not establish that the defendant's statements to the CPS worker were "the product of words or actions on the part of the police that were likely to elicit an incriminating response." *Id.* at 38. Therefore, we found that the defendant's statements did not stem from custodial interrogation by a law enforcement agent, and the CPS worker was not required to give *Miranda* warnings or follow the statutory procedures of article 38.22. *Id. See generally, Rhode Island v. Innis*, 446 U.S. 291, 303, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

25. See *Cantu v. State*, 817 S.W.2d 74, 75–76 (Tex.Crim.App.1991); *Cates v. State*, 776 S.W.2d at 172; *McCrory v. State*, 643 S.W.2d 725, 734–35 (Tex.Crim.App.1982). For example, in *Cates*, the evidence gathered by a CPS caseworker was instrumental to the defendant's arrest for child abuse. 776 S.W.2d at

173. The defendant was in jail on these charges when the CPS worker interviewed him. *Id.* This Court held that the questions the CPS worker asked the defendant were "calculated to evoke incriminating responses relevant to the pending charges." *Id.* at 173. In that case, the CPS worker not only investigated the suspected child abuse, but followed up with post-arrest interrogation to gather additional evidence for the criminal prosecution of the case in which she had played a major role in his arrest. In such a case, the police and CPS were working in tandem and moving forward as a team from the inception of the investigation. Rather than simply conducting a "routine interview to assist [CPS] in solving the abuse problem within the family unit .... [the CPS worker] was conducting a criminal investigation and officially operating to assist those police agencies responsible for enforcing the State's criminal laws." *Id.* at 174. In that case, the CPS worker had removed her "child-protection" hat and put on an "evidence-collection" hat.

26. *Ackley v. State*, 592 S.W.2d 606, 608 (Tex. Crim.App.1980).

27. *Buchoz v. Klein*, 143 Tex. 284, 286, 184 S.W.2d 271, 271 (1944).

of the police by interrogating a person in custody, that agent is bound by all constitutional and statutory confession rules, including *Miranda* and Article 38.22.[28]

■ It is sometimes difficult to determine whether the two paths, that of the police and that of CPS, are parallel or whether they have converged in a particular case. To do so, courts must examine the entire record. Central to this evaluation are the actions and perceptions of the parties involved: the police, the CPS caseworker (or other potential agent of the police), and the defendant himself.

■ First, courts should look for information about the relationship between the police and the potential police agent. Did the police know the interviewer was going to speak with the defendant? Did the police arrange the meeting? Were the police present during the interview? Did they provide the interviewer with the questions to ask? Did they give the interviewer implicit or explicit instructions to get certain information from the defendant? Was there a "calculated practice" between the police and the interviewer that was likely to evoke an incriminating response from defendant during the interview?[29] And finally, does the record show that the police were using the agent's interview to accomplish what they could not lawfully accomplish themselves?[30] In sum, was law enforcement attempting to use the interviewer as its anointed agent?

■ Second, courts should examine the record concerning the interviewer's actions and perceptions: What was the interviewer's primary reason for questioning the person? Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal? How did the interviewer become involved in the case? Did the interviewer help "build a case" that led to the person's arrest,[31] or was the interviewer pursuing some other goal or performing some other duty? At whose request did the interviewer question the arrestee? In sum, did the interviewer believe that he was acting as an agent of law enforcement?

■ Finally, courts should examine the record for evidence of the defendant's perceptions of the encounter. When the defendant was interviewed, did he believe that he was speaking with a law-enforcement agent, someone cloaked with the actual or apparent authority of the police? What gave him this impression?[32] Alter-

---

28. See *Cantu,* 817 S.W.2d at 75; *Cates,* 776 S.W.2d at 172; *McCrory,* 643 S.W.2d at 734.

29. *See Cates,* 776 S.W.2d at 172.

30. *Id.* (CPS worker will be categorized as an agent of law enforcement if the record establishes "that when the [defendant] made the admissions, the DHR employee was utilizing her capacity so as to accomplish what the police could not have lawfully accomplished themselves").

31. *See Cates,* 776 S.W.2d at 173.

32. Apparent authority arises only through acts of participation, knowledge, or acquiescence by the principal (the police) that clothe the agent with the indicia of apparent authority. *See NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 952–53 (Tex.1996) (*per curiam*); *Southwest Title Ins. Co. v. Northland Bldg. Corp.,* 552 S.W.2d 425, 428 (Tex.1977) ("Only the conduct of the *principal,* leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent."). Thus, only if there is evidence that the police have acted in some manner to cloak the third-person with authority to interrogate a suspect on their behalf and that apparent authority is communicated to the suspect, will the suspect's perceptions be relevant.

natively, would a reasonable person in defendant's position believe that the interviewer was an agent of law enforcement? [33]

 At bottom, the inquiry is: Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee? [34] Put another way, is the interviewer acting as an "instrumentality" or "conduit" for the police or prosecution? [35] Most simply: is the interviewer "in cahoots" with the police?

### III.

 Appellant argues that the court of appeals did not conclude that Ms. Lane–Martines was an agent of law enforcement. He contends that the factual findings by the court of appeals were

> pure dicta. The court did not rely on them in any way for its decision, nor were they necessary to that decision. The courts *full* reliance for its holding was that once Appellant moved to suppress, the burden was on the State to establish the giving of *Miranda* /38.22 warnings, and the State did not go forward to meet that burden.[36]

---

**33.** As one court has phrased it,

> Unless a person realizes that he is dealing with the police, their efforts to elicit incriminating statements from him do not constitute "police interrogation" within the meaning of *Miranda*. It is the impact on the suspect's mind of the interplay between police interrogation and police custody—each condition *reinforcing* the pressure and anxieties produced by the other—which creates "custodial interrogation" within the meaning of *Miranda*. It is the suspect's realization that the same persons who have cut him off from the outside world, and have him in their power and control, want him to confess, and are determined to get him to do so, that makes the "interrogation" more menacing than it would be without the custody and the "custody" more intimidating than it would be without the interrogation.

*State v. Loyd,* 425 So.2d 710, 716 (La.1982).

**34.** *See Cates,* 776 S.W.2d at 172; *Paez,* 681 S.W.2d at 37. Both the State and appellant note the 2003 revisions to the Family Code in § 261.301(f) which require "the highest priority" reports of child abuse to be conducted "jointly" by a local law enforcement agency and CPS investigator. That provision went into effect after this interview, thus the issue of "joint" investigations is not presently before the Court, and we express no opinion on the operation of that statutory provision. Suffice it to say that Ms. Lane–Martines testified that she was acting pursuant to her legal duty to notify parents of the emergency removal of children from the home under § 262.109.

**35.** *See People v. Kerner,* 183 Ill.App.3d 99, 131 Ill.Dec. 667, 538 N.E.2d 1223, 1224–25 (1989) (child-services worker acted as a "conduit for information" against defendant in custodial setting where worker requested assistance from police in his investigation of sexual abuse by defendant on children; defendant was escorted to interview with worker at police chief's office by police officer; door was locked during interview; statement was given on police form; officers and a prosecutor entered office immediately thereafter and arrested defendant; and the child-services worker and police officer exchanged information both before and after interview).

**36.** Appellant's position is that

> No matter who interviewed Appellant; no matter what his custodial status was or for what offense he was incarcerated; no matter what the investigator knew, or planned to do, or had a duty to do, or in fact did do; the court's single solitary holding remains—the State did not go forward on the warnings issue when the defense moved to suppress, and the State has simply not challenged that issue in this Court.

Although appellant might reasonably construe the court of appeals's opinion in this manner, we cannot read its opinion as holding that the mere making of a motion to suppress casts a burden upon the State to show that *Miranda* warnings were given. We conclude that the court of appeals meant that the State had a burden to show that proper warnings were given *because* appellant had proven certain facts. *See* note 8 *supra*.

We conclude, however, than appellant misconstrues the law and reads the court of appeals's opinion too literally. The mere filing of a motion to suppress does not thrust a burden on the State to show compliance with *Miranda* or article 38.22 warnings *unless and until* the defendant proves that the statements he wishes to exclude were the product of custodial interrogation. Thus, the State has no burden at all unless *"the record as a whole clearly establishe* [s]" that the defendant's statement was the product of custodial interrogation by an agent for law enforcement.[37] It is the defendant's initial burden to establish those facts on the record.

■■■ We turn now to the record in this case to decide whether the court of appeals was mistaken in holding that the trial court abused its discretion in implicitly concluding that Ms. Lane–Martines was not an agent of law enforcement who was required to comply with *Miranda* warnings and all of the procedures required under article 38.22.

This record is, at best, sparse. The record does show that Ms. Lane–Martines, the CPS investigator, met with appellant for the first time on February 11, 2002, when he was already in custody on the charges concerning Andrew's burns. It is unclear from the record whether the police or the hospital called CPS, but CPS took custody of the children because both of their parents had been arrested and there were no other known family members.

What is evident from the record is that Ms. Lane–Martines visited appellant in jail as part of a routine CPS procedure. She had a duty imposed by the Texas Family Code to notify and interview parents within one working day of their children's removal from the home.[38] It was for this purpose, rather than any law enforcement purpose, that she met with appellant. Furthermore, the record fails to show that there was any "calculated practice" between Ms. Lane–Martines and the police which was likely to elicit an incriminating response. Nor does the record show that the police used Ms. Lane–Martines to accomplish what they could not lawfully accomplish themselves. In fact, it appears that the police were not involved in the CPS investigation at all.[39]

The court of appeals stated that appellant proved that Ms. "Lane–Martines interrogated him about his culpability concerning the instant offense,"[40] that appellant was in jail for the instant offense, that she was employed by a state agency, that "she knew when she went to the jail to interview appellant that, when she questioned a defendant and made documentation of what he told her, the report of the questioning would be forwarded by duty of law to the police agencies[,]" and that "she turned over the results of her interrogation to the Crowley police; and that information was used as a basis for prosecuting appellant."[41] But the mere fact that Ms.

37. *Paez,* 681 S.W.2d at 36 (emphasis in original) (quoting *McCrory v. State,* 643 S.W.2d 725, 734 (Tex.Crim.App.1982)).

38. Tex. Fam.Code § 262.109.

39. The entire objection, voir dire, argument, and ruling is quoted in footnote four.

40. 144 S.W.3d at 152. Ms. Lane–Martines said that she had taken pictures at Brydon's

school of the marks on his body and that she asked appellant what happened to Brydon.

41. *Id.* Ms. Lane–Martines testified: "If a report is made to the police, I don't believe they arrest them based on my report. A report can be made to the police about a certain incident, and they would investigate it, and an arrest would be made based on their investigation, not on mine." Although it is possible to infer from this statement that Ms. Lane–

Lane–Martines may have told police about appellant's incriminating statement is not sufficient to transform her into an agent of law enforcement.

There is nothing in the record to indicate that the investigating police knew about Ms. Lane–Martines's interview, that they spoke to her before the interview, that they asked her to question appellant at all or in any particular manner, or that they made any attempt to use her as a conduit for interrogation purposes. Nor is there anything in this record that indicates that it was Ms. Lane–Martines's intention to investigate on behalf of, or in tandem with, the Crowley police.

Finally, there is nothing in the record concerning appellant's perceptions or how he viewed Ms. Lane–Martines's purposes in asking him about Brydon. Therefore, we can only evaluate the situation from the standard of a reasonable person in appellant's position. Ms. Lane–Martines told appellant that she was a CPS investigator there to interview him and inform him about the "removal" status of his children because there was no available family member to take custody. Without more information to the contrary, we cannot conclude that a reasonable person in appellant's position would have believed that Ms. Lane–Martines was an agent of law enforcement.

In sum, based on this record, the trial court did not abuse its discretion when it implicitly concluded that Ms. Lane–Martines was not acting as an "agent of law enforcement" for the purposes of *Miranda* when she interviewed appellant, and therefore admitted her testimony about appellant's statement concerning how he had

Martines did, in fact, turn over the results of her interview to the Crowley police and that the present prosecution was based upon that report, the trial court was not obliged to reach that conclusion.

spanked Brydon. In this particular situation, the trial court's ruling that the CPS investigator was not an agent of law enforcement was within the zone of reasonable disagreement. The court of appeals was mistaken in concluding otherwise.

Therefore, we reverse the judgment of the court of appeals, and affirm the judgment of the trial court.

WOMACK, J., concurred in the result.

MEYERS, J., not participating.

KELLER, P.J., filed a concurring opinion.

KELLER, P.J., filed a concurring opinion.

I agree with the Court that "[t]he term 'agency' denotes a consensual relationship which exists between two persons where one of them is acting for or on behalf of the other,"[1] and I agree that the CPS worker did not qualify as an agent of law enforcement. However, I disagree with the Court's formulation of the agency test as "acting in tandem" with law enforcement. Acting "in tandem with" suggests a broader meaning than "acting for or on behalf of" and might serve to sweep within the Court's holding situations that are not true examples of agency. To avoid confusion, I would eschew the "in tandem" language and stick with the traditional definition of agency.

I also disagree with the Court's suggestion that the defendant's perceptions have anything to do with the question of agency status. Rather, the defendant's perceptions are relevant to the issue of custodial interrogation. In support of its

1. Court's op. at 529.

**534**

suggestion, the Court cites *State v. Loyd,* a Louisiana case, for the proposition that *Miranda* was not violated when the defendant was unaware of the status of a government informant.[2] But as the Court's quotation shows, *Loyd* held that the informant's conduct did not constitute custodial interrogation.[3] In fact, *Loyd* presciently anticipated what the Supreme Court would later hold in *Illinois v. Perkins:* that *Miranda* does not bar unwarned statements made to *undercover* law enforcement agents.[4] The reason for this is that, when the defendant is unaware of the law enforcement agent's status, he is not subjected to the coercive pressures that transform a conversation into "custodial interrogation."[5]

But agency status is a separate matter, as is well illustrated by the Supreme Court decision in *Massiah v. United States.*[6] In *Massiah,* the defendant was unaware that the informant was an agent of law enforcement, but because the defendant's Sixth Amendment right to counsel had attached, statements deliberately elicited by that informant were inadmissible.[7] We have recently addressed the question of agency status in the Sixth Amendment context and explained that an informant was not a government agent when the informant had no agreement with and was not acting under instructions from a government official.[8] The factor that distinguishes *Perkins* from *Massiah,* making the defendant's perceptions relevant to whether he suffered a constitutional violation, is that "custodial interrogation" matters in the

Fifth Amendment *Miranda* context but not in the Sixth Amendment right to counsel context. Both contexts do require that the statements be elicited by a law enforcement agent, but with agency status being determined by the alleged agent's actual relationship with law enforcement, not by the defendant's perceptions.

With these comments, I concur in the Court's judgment.

---

**2.** *See State v. Loyd,* 425 So.2d 710, 716 (La. 1982).

**3.** Court's op. at 531 n. 33 (quoting *Loyd, supra* ).

**4.** *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).

**5.** *Id.*

**6.** 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**7.** *Id.; Perkins,* 496 U.S. at 299, 110 S.Ct. 2394 (distinguishing *Massiah* ).

**8.** *Manns v. State,* 122 S.W.3d 171, 183–184 (Tex.Crim.App.2003)