**Affirmed as Modified; and Opinion Filed October 16, 2013**



In The

**Court of Appeals**
**Fifth District of Texas at Dallas**

_____

**No. 05-12-01021-CR**
_____

**JONATHAN PETERSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-61407-W**

## OPINION

Before Justices FitzGerald, Francis, and Myers
Opinion by Justice FitzGerald

Appellant was indicted for capital murder of a child and entered a plea of not guilty. A jury convicted him of the lesser included offense of serious bodily injury to a child and assessed punishment at eighty years' imprisonment. On appeal, appellant complains that the trial court abused its discretion in admitting statements he made to a CPS worker without *Miranda* warnings and there is insufficient evidence in the record to support the trial court's order of costs. Appellant also urges that the judgment be reformed to accurately reflect the prosecutors who tried the case. We reform the judgment to accurately reflect the prosecutors who tried the case, and as reformed, affirm.

## BACKGROUND

On September 28, 2010, twenty-one-month-old Bronson Franklin, Jr. suddenly died as a result of multiple blunt force trauma injuries to virtually every portion of his body. A Dallas Fire

and Rescue paramedic testified that he was dispatched to Bronson's apartment complex at 5:20 p.m. When the paramedic arrived at the complex, appellant ran toward the ambulance carrying Bronson in his arms. Bronson was limp, unresponsive, unconscious and not breathing. When asked what had happened, appellant told the paramedics that the child "was drinking some water out of 16-ounce bottle and he fell and he busted his lip and fell back," presumably hitting his head. Appellant also stated he "just couldn't believe this would happen."

The paramedic administered CPR as Bronson was transported to the hospital. As blood again started circulating through the child's body, the paramedic observed several different bruises that appeared on the child's genitals, back, buttocks, and legs. The paramedic further observed a cigarette burn on the child's hand.

The Dallas police officer dispatched in response to the 911 call found appellant standing outside the trauma room at the hospital. The officer described appellant as "a little upset . . . somewhat concerned." Appellant had his head down and was talking to himself, and at one point the officer overheard him say that he hoped he had not hit the child too hard.

The officer also saw Bronson in the trauma room, and observed that he had been "beaten up almost beyond recognition." Bronson was later transported by Care Flight to Children's Medical Center. Appellant asked the officer if he could ride with him to Children's Medical Center, and the officer agreed. When the officer arrived at Children's Medical Center, he was informed that Bronson had died.

Appellant often stayed with Bronson's mother at her apartment. On the day in question, she left Bronson in appellant's care while she went to work. At around 5:00 p.m., she received a telephone call from appellant advising that Bronson had choked on some food and water, and the paramedics were attempting to revive him. When Bronson's mother later saw her son at Children's Medical Center, he had bruises all over his body and knots on his head. She was

immediately aware that appellant had lied to her when he said that Bronson had choked on some food and water.

Dallas Police Detective Sabra Garibay observed Bronson's body at the hospital and described it as extremely bruised and covered with lots of marks. Garibay requested that appellant accompany her to the police station for questioning, and he agreed.

Garibay's partner questioned Bronson's mother while Garibay questioned appellant. After Garibay noticed some discrepancies between the two versions of events, appellant was "*Mirandized*." After receiving his *Miranda* warnings, appellant elected to continue speaking with Garibay. During the interview, appellant stated that he hit the child three times. When the interview concluded, appellant was arrested.

An autopsy was performed the day after the interview. The medical examiner testified that Bronson died of multiple blunt-force trauma injuries, all of which appeared to have been caused at the same time. The medical examiner described twelve or thirteen impact sites on the child's face and head, and multiple bruises in the abdomen area and around the buttocks and upper thighs. Although the medical examiner could not determine what object or force had been used to cause the injuries, he stated that it was deadly. He also testified that the injuries did not result from being hit three times with a belt, and the child did not die as a result of choking on water.

Appellant remained incarcerated after his arrest, and was visited by an investigator from Child Protective Services ("CPS"). The investigator, Kara Miller, did not advise appellant of his *Miranda* rights before she interviewed him and did not record the interview. During the interview, appellant admitted that he had been frustrated with Bronson because he would not stop crying. Appellant said that he "lost control" and hit Bronson. When Miller asked for further explanation, appellant began to cry and declined to elaborate.

The jury found appellant guilty of serious bodily injury to a child and assessed punishment at eighty years' imprisonment. This appeal followed.

**ANALYSIS**

*Admission of Oral Statement*

In his first two issues, appellant asserts the trial court erred in admitting the statement he made to the CPS worker without the benefit of *Miranda* warnings and the procedures mandated by article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. § 38.22 (West 2006). The State responds that neither *Miranda* nor article 38.22 were implicated in this case.

We review a trial court's decision to admit testimony of a CPS worker for an abuse of discretion. *See Berry v. State*, 233 S.W.3d 847, 856 (Tex. Crim. App. 2007); *Wilkerson v. State*, 173 S.W.3d 521, 524 (Tex. Crim. App. 2005). Under that standard, we must affirm the trial court's decision to admit the testimony if the decision is within a zone of reasonable disagreement. *See Berry*, 233 S.W.3d at 858.

The United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. As a corollary to that provision, in *Miranda v. Arizona*, 383 U. S. 436, 478–79 (1966), the United States Supreme Court held that when an individual is subjected to custodial interrogation, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id*. at 444.

Article 38.22 provides that no oral statement of an accused made as a result of a custodial interrogation may be admissible against the accused in a criminal proceeding unless, among other requirements, an electronic recording of the statement is made, the accused is given

–4–

*Miranda* warnings, and the accused waives any rights set out in the warning. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005).

But the procedural safeguards of *Miranda* and Article 38.22 do not apply to all custodial questioning. *Wilkerson*, 173 S.W.3d at 527. They apply only to custodial interrogation by law enforcement officers or their agents. *Id*. Although a CPS worker is an employee of the state, state employment does not, by itself, make a person a state agent for purposes of defining custodial interrogation. *See id*. at 528. As the *Wilkerson* court explained:

> Although state employment clearly makes a person an "agent of the State," that label does not, by itself, make the person an "agent of the State" for the purpose of defining "custodial interrogation." Not all government workers must be familiar with and ready to administer *Miranda* warnings . . . . [W]hen "the official has not been given police powers, *Miranda* has been held inapplicable to questioning by [state officials]."

*Id*. at 528. The court further observed that different types of state employees serve different roles. *Id*. CPS workers are charged with protecting the welfare and safety of children in the community while the police are responsible for investigating crime. *See id*. Therefore, police officers and CPS workers generally run on separate, yet parallel paths. *Id*. at 529. But if the parallel paths of CPS and the police converge, and police and state agents are investigating a criminal offense in tandem, *Miranda* warnings and compliance with article 38.22 may be necessary. *Id.*

To determine whether the two paths have converged, courts must examine the entire record. *Id* at 530. The thrust of the inquiry is whether the custodial interview was conducted explicitly or implicitly on behalf of the police for the purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee. *Id*. at 531. In making this determination, we consider (1) the relationship between the police and the potential police agent, (2) the interviewer's actions and perceptions, and (3) the defendant's perceptions of the encounter. *Elizondo v. State*, 382 S.W.3d 389, 394 (Tex. Crim. App. 2012).

Here, the CPS worker, Miller, testified initially outside the presence of the jury. Appellant's trial counsel objected that Miller improperly obtained incriminating testimony and was an agent of the state "as that term is recognized under Miranda . . . and 38.22." The trial court overruled the objection, and allowed Miller to testify before the jury.[1]

Miller testified that her supervisor assigned this case to her for investigation. Miller's office is in the Dallas Children's Advocacy Center, which is housed in the same building as the police. Miller explained that CPS conducts its own investigations, separate from the police, and the police do not tell CPS how to conduct the investigation. Miller stated that the goal of CPS is to ensure the safety of children, and this has nothing to do with whether criminal charges are filed.

Once she was assigned to the case, Miller spoke briefly with the police to set up a forensic interview for Bronson's surviving sibling. Miller did not know what appellant told the police, and the police were not specifically informed that she planned to interview appellant. Miller stated that CPS has no obligation to inform the police about what she is doing in her investigations, nor is she required to have the police accompany her when she conducts interviews. In addition to her brief conversation with the detective, Miller was present at the autopsy and spoke with the medical examiner.

According to Miller, it is CPS policy to speak with all principals and caregivers of the children. Prior to her interview with appellant, Miller spoke with the child's mother and learned that there were no other children living in the house. There was another child, but she was living in a different city with the grandmother. Miller also spoke with the child's grandmother. Although she was informed that no other children lived in the home prior to her interview with

---

[1] Defense counsel requested and was granted a continuing objection to Miller's testimony.

appellant, Miller still did not know whether appellant had children of his own or had access to other children.

Miller explained that she interviewed appellant because he lived in the home and had been a caregiver for the deceased child. She described the purpose of her interview as "to gather social history, to make sure he doesn't have any other kids, and to investigate the death of the child." Because appellant was in jail, Miller interviewed him there.

When Miller arrived to speak with appellant, she introduced herself and told him why she was there. Miller told appellant that CPS works with the police, but performs a separate investigation. Appellant was informed that the CPS part of the investigation did not pertain to the criminal charges, but rather his background and an assessment of the safety of any children that may be involved.

Miller asked appellant whether he had any children, and appellant told her he may have a child, but was not sure. Appellant gave Miller his social history and generally discussed his care of Bronson. When Miller asked appellant what happened on the day in question, appellant told her Bronson had been running around and crying. Appellant told him to sit down or he would "whoop his ass." When the child continued to cry, appellant hit him with his belt on his "butt and thighs." According to appellant, Bronson stopped crying shortly thereafter, and he gave him some water. When Bronson fell and hit his head, appellant called 911.

Based on her interview with Bronson's mother, Miller knew that appellant and the mother had been exchanging text messages all day about the mother's pending move to another city. Miller asked appellant if he was upset about that. Initially, appellant indicated that it was not a problem. Miller then explained the medical findings to appellant, and asked again what had happened. When appellant gave her the same version of events, Miller told him "that's not what the medical findings are stating." Appellant then told Miller that he was frustrated because

Bronson would not stop crying, and he lost control and started hitting Bronson. When Miller pressed for detail as to what a "loss of control" entailed, appellant began to cry and said he would only tell Bronson's mother.

Miller testified that she is obligated by law to report all aspects of child abuse to the police. The day after appellant's interview, she reported his statement to the police.

Appellant insists that the relationship between Miller and the police shows that Miller acted as an agent for the police. In support of this contention, appellant points out that the investigation of Bronson's death was one of Miller's express purposes, and she reported appellant's statements to the police the day after the interview. Appellant also relies on the fact that Miller spoke to both the detective and the medical examiner before the interview.

Having reviewed this evidence in the context of the entire record, we conclude the trial court did not err in its implicit finding that Miller was not acting as an agent of law enforcement who was required to comply with *Miranda* and article 38.22. Although Miller spoke with the detective prior to the interview, the record reflects that the conversation pertained to the logistics of the forensic interview of the other child. There is no detail concerning anything else that may or may not have been discussed. It is reasonable to infer, however, that the detective did not discuss his interview with appellant, because Miller testified she was not aware of what appellant had told the police. The police did not tell Miller to interview appellant, did not arrange the interview, and did not accompany Miller when she conducted the interview. Similarly, although Miller testified that she spoke with the medical examiner before she interviewed appellant, the record is silent as to the specifics of that conversation.

Although Miller did identify investigation of the child's death as one of the purposes of the interview, there is nothing to establish that she was conducting a criminal investigation. To the contrary, Miller testified that the primary purpose of CPS investigations is to ensure the

–8–

safety of any children that may be involved. She expressly stated that CPS investigations differ from criminal investigations. The fact that Miller elicited incriminating evidence does not establish that it was her purpose to do so. Once appellant made the incriminating statement, Miller was legally obligated to inform the police.

While appellant did not testify about his perceptions of the encounter, Miller testified that she explained who she was and why she was there. There is nothing in the record to suggest that appellant perceived Miller as an agent of law enforcement.

Appellant had the burden to demonstrate that Miller was acting as an agent of law enforcement. *Wilkerson*, 173 S.W.3d at 529. Although Miller confronted appellant with the results of the autopsy report and challenged his version of events, appellant did not meet his burden to show that she did so at the behest of or in tandem with law enforcement.

Our examination of the evidence leads us to conclude that the interview was not conducted, explicitly or implicitly, on behalf of the police for the purpose of gathering evidence to be used against appellant in a criminal prosecution. Because we conclude Miller was not acting as an agent of law enforcement, the trial court did not abuse its discretion in admitting her testimony. Appellant's first two issues are overruled.

### *Costs*

In his third issue, appellant complains that there is no bill of costs to support the assessment of $244 in costs. Following submission of this case, we ordered the Dallas County Clerk to prepare a supplemental clerk's record containing a detailed itemization of the costs and fees assessed in this case along with an explanation of any abbreviations used to define the costs and fees. *See* TEX. CODE CRIM. PROC. ANN. arts. 103.001, .006 (West 2006). The Dallas County Clerk complied and provided a supplemental record with a certified bill of costs.

In response to the Court's order requiring supplementation of the record, appellant objected that the bill of costs in the supplemental record is not a "proper bill of costs" and the bill of costs was not filed in the trial court or brought to the trial court's attention before costs were entered in the judgment.

Appellant's objection is misplaced. A signed and certified certification from the district clerk containing the costs that have accrued to date meets the mandate of the code of criminal procedure. *See id*.; *Coronel v. State*, No. 05-12-00493-CR,2013 WL 3874446, at * 4 (Tex. App. Dallas 2012, no pet. h.). Further, as the *Coronel* court observed, "court costs are mandated by statute; they are not discretionary and therefore are not subject to approval or authorization by the trial court. Likewise, the code does not require the bill of costs be filed at the time the trial court signs the judgment of conviction." *Id.* Appellant's objection is overruled.

Because the record now contains a bill of costs supporting the assessment of costs in the judgment, appellant's complaint is moot. *Id*.; *see also Franklin v. State*, 402 S.W.3d 894, 895 (Tex. App.—Dallas 2013, no pet.). Appellant's third issue is overruled.

### *Reformation of Judgment*

The judgment reflects that the prosecutor was Elaine Evans, but the record reflects that the prosecutors were Amy Derrick and Carmen White. We have the authority to amend the judgment to "speak the truth" when we have the necessary data and information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993).

We therefore reform the judgment to reflect that Amy Derrick and Carmen White were the prosecutors in this case. As reformed, the trial court's judgment is affirmed.


Do Not Publish
TEX. R. APP. P. 47
121021F.U05

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JONATHAN PETERSON, Appellant

No. 05-12-01021-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-61407-W.
Opinion delivered by Justice FitzGerald.
Justices Francis and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED**
to reflect that Amy Derrick and Carmen White were the prosecutors in this case.
As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered October 16, 2013

/Kerry P. FitzGerald/

KERRY P. FITZGERALD
JUSTICE