**REVERSE and REMAND; and Opinion Filed June 23, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-01210-CR

**THE STATE OF TEXAS, Appellant**

**V.**

**TYRAN DIONNE SPENCER, Appellee**

**On Appeal from the County Criminal Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. MB12-55346**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Brown
Opinion by Justice Brown

In the course of this prosecution for operation of a motor vehicle while intoxicated, the trial court granted appellee Tyran Dionne Spencer's motion to suppress all evidence resulting from what she contends was an illegal blood draw by hospital personnel. The State appeals. We reverse and remand this cause for further proceedings.

### Background

Around 11:00 in the evening on April 8, 2012, Spencer struck a utility pole with her car. She was still sitting in her car when police officers arrived at the scene. The officers spoke with Spencer and observed that she had bloodshot eyes, slurred speech, alcohol on her breath, and unsteady balance. Spencer told the paramedics that she did not need any medical treatment, and the paramedics did not find any physical injuries. But based on Spencer's elevated blood

pressure, the paramedics took Spencer to the emergency room at Baylor University Medical Center in Dallas. At Baylor, Spencer denied being in any pain.

Two of the officers at the scene went to the emergency room with Spencer. There, one of the officers asked Spencer whether she had been drinking. She admitted to drinking earlier that day. The officer also gave Spencer the HGN test to which Spencer showed signs of intoxication. The officer then read Spencer the statutory warning and asked her to provide a blood sample. Spencer refused. Hospital personnel, however, drew Spencer's blood within twenty minutes of her arrival at Baylor. The results of the blood draw revealed that Spencer had an elevated blood alcohol level and was intoxicated. Spencer did not consent to the blood draw at the time it was taken, but she signed a consent form for treatment by the hospital before her discharge several hours later. The medical records show Spencer sought follow-up treatment from Baylor for back and neck pain.

Spencer moved to suppress the evidence that resulted from the blood draw because the blood draw was without her consent and the officers did not obtain a warrant to draw her blood. The trial court held a hearing on the motion to suppress. Spencer was the only witness that testified, and her consent form, results of the blood test, and other medical records from Baylor were admitted as exhibits. Spencer testified that both before and after she told officers they could not take her blood, a nurse tried to take her blood. She said "they kept asking [her] over and over again if they could take [her] blood." She remembered being frustrated because she was asked to provide a blood sample and she kept telling "them" no. When someone tried to stick a needle in her arm, she tried to take it out. Spencer testified that "they continued anyway" and forcefully held her down to take her blood. Spencer clarified that it was not "officers" who asked her over and over for a blood sample. She said "people" were "in and out of the room" and the officers were among those people that asked to take her blood. She does not know how

–2–

long the officers stayed at the hospital. Spencer said she signed the consent for medical treatment "very, very late" after her blood was drawn.

After hearing Spencer's testimony and reviewing additional briefing submitted by the parties at the court's request, the trial court granted Spencer's motion to suppress and announced its findings of fact and conclusions of law on the record. The court stated that this was a DWI investigation from the time the officers first arrived at the scene, and it was reasonable for the paramedics to deduce the fact of the investigation based on their interaction with and observations of the officers. The court added that the paramedics and hospital personnel followed their required protocol in treating Spencer "despite no obvious reason to treat" her and the hospital personnel "no doubt" witnessed the officer interrogating Spencer and administering the HGN test. The court found that while the paramedics and hospital personnel acted appropriately, they acted in concert with and were "agents of the police." The court concluded that under these facts, the police officers should have procured a warrant to draw Spencer's blood, and because they did not do so, and no exception to the required warrant applied, the evidence from the blood draw was suppressed.

## Discussion

The State attacks the merits of the trial court's ruling on the motion to suppress in its second issue. Specifically, the State argues that the record does not support a conclusion that an agency relationship existed between the police officers and hospital personnel and therefore, the trial court erred in granting Spencer's motion to suppress. We agree with the State.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). That is, we review the trial court's factual findings for an abuse of discretion but review the trial court's application of the law to the facts de novo. *Id.* We give almost complete deference to the trial

court's determination of historical facts, particularly when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Id.*; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We also afford the same deference to mixed questions of law and fact if resolving those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. We review mixed questions of law and fact that do not depend on credibility and demeanor as well as purely legal questions de novo. *Id.*; *State v. Woodward*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

"The term 'agency' denotes a consensual relationship which exists between two persons or parties where one of them is acting for or on behalf of the other." *Wilkerson v. State*, 173 S.W.3d 521, 529 (Tex. Crim. App. 2005). But the law does not presume an agency relationship, and the person alleging the existence of an agency relationship has the burden of proving it. *Elizondo v. State*, 382 S.W.3d 389, 395 (Tex. Crim. App. 2012) (citing *Wilkerson*, 173 S.W.3d at 529). To determine whether the hospital personnel were agents of and were, in fact, working for or on behalf of the police officers, we examine the entire record and consider (1) the relationship between the police and the hospital personnel as the potential police agent, (2) the hospital personnel's actions and perceptions, and (3) Spencer's perceptions of the encounter. *Wilkerson*, 173 S.W.3d at 530–31. Stated another way, we look to see if the hospital personnel were "in cahoots" with the police officers for purposes of obtaining evidence from Spencer's blood draw. *Id.* at 531.

When we consider the relationship between the police officers and the hospital personnel, we look for "information about the relationship between" the police and the hospital personnel. *Id.* at 530. We ask whether the police were present during the blood draw or gave the hospital personnel instructions to draw Spencer's blood. *Id.* We also determine whether the record shows that the police were using the hospital personnel as its "anointed agent." *Id.* Here, there

is nothing in the evidence presented at the suppression hearing showing that the officers attempted to use the hospital personnel as their agents. *See id.* at 530–31. While Spencer testified that the officers were among the "people" that asked to take her blood, there is nothing in the record linking the officers' request and presence at the hospital to the hospital personnel's decision to draw Spencer's blood. Spencer's testimony reveals that the officers' request to take her blood was not the first request; she said that a nurse had tried to draw her blood both "before and after" the officers' request. And the medical records do not indicate that the officers provided the nurse with instructions to take Spencer's blood or that the nurse or lab technician drew Spencer's blood at the request of the officers. Spencer did not know how long the officers stayed at the hospital, and she was unclear about who was in and out of the room during her time there. In particular, nothing in her testimony or the medical records suggests that the officers were in the room at the time she was restrained and her blood was drawn.

There also is nothing in the record to show that the reason the hospital personnel took Spencer's blood was for the purpose of gaining evidence to support a criminal prosecution. *Id.* at 530. When we examine the record and consider the hospital personnel's actions and perceptions, we look for the "primary reason" behind the decision to draw Spencer's blood. *Id.* The trial court noted that both the paramedics and hospital personnel followed their own "required protocol[s]" in treating Spencer. And once Spencer arrived at the hospital, the actions and perceptions of the hospital personnel appear to be aimed at providing treatment to her. According to the medical records admitted as an exhibit at the suppression hearing, Spencer arrived at the hospital at 11:17 in the evening. Those records reflect that the hospital was presented with a patient that had been in a car accident in which she hit a pole and broke it in half. The hospital personnel noted on the nursing record that while Spencer denied being in pain, was in no apparent distress, and cooperative, she also had had an "[u]nsteady gait" and displayed

"Impulsive" cognition. The notes further reflect that it had been reported that Spencer had been drinking. Her blood was drawn at or around 11:35 in the evening. But a blood alcohol test was not the only test ordered for her; rather, the record is clear that the hospital personnel ordered a number of tests to be performed on Spencer's blood specimen. The personnel also ordered, among other things, a CT scan to assess Spencer for a head injury and a scan of her abdomen and pelvis, citing abdomen pain status post trauma as the reason for the exam. The hospital personnel indicated that the results from the blood tests and CT scans were needed immediately as indicated by the listed priority level of "STAT." Around the time Spencer's blood was drawn, the nurse applied a cervical collar. And shortly thereafter, she was admitted to monitor her condition with the goal of "[i]mprov[ing] [her] comfort level." Upon her discharge, Spencer signed the form consenting to being treated by the hospital. The care provided by the hospital personnel continued after Spencer's discharge. The nursing records show that after radiology recommended a follow-up evaluation, the personnel tried to contact her. Spencer was informed during a phone conversation about the "severity of [her] injury."

Finally, when we examine the record for evidence of Spencer's perceptions of the encounter with the hospital personnel, there is nothing to support a conclusion that Spencer believed the hospital personnel that treated her were "cloaked with the actual or apparent authority of the police." *Id.* at 530–31. Nor is there anything in the record to suggest that a reasonable person in Spencer's position would believe that the hospital personnel were acting as agents of the police officers. *Id.* Spencer testified that she did not tell the paramedics that she wanted to go to the hospital and she tried to pull the needle out of her arm. She explained, however, that she tried to take the needle out of her arm because she is "scared of needles," not because she had already refused the officers' request for a blood sample or thought the actions of the hospital personnel were tied to the officers' request.

Spencer argues that the standard of review applied in this case is highly deferential to the trial court's determination of witness credibility and historical facts and based on her testimony and medical records, a reasonable inference can be drawn that her blood was taken at the direction of the police. She points out that she denied needing medical treatment and that both nurses and police officers kept asking her over and over again if they could take her blood. She adds that the record is unclear whether she was "actually suffering from any malady," and the "immediacy of the blood draw just as likely supports the trial court's conclusion that it was done at the behest of insisting police officers."

But while our review is deferential to the trial court's determination of historical facts and view of the evidence, there has to more than unclear, vague references to "they" to support the finding that the hospital personnel acted in concert with the police officers when the personnel took Spencer's blood. *See id.* at 530–32; *Elizondo*, 382 S.W.3d at 395–96. The trial court stated that the paramedics and hospital personnel could deduce from the police interactions with Spencer that this was a DWI investigation. But the court does not specify which facts support this statement. Spencer's testimony about who asked for the blood draw, when the request was made, and whether the officers were even around when the blood was taken is sparse, and at best, ambiguous as to the reasons for the blood draw. In addition, the medical records are silent on any police interaction with the hospital personnel, and Spencer only testified that the officers were among the hospital personnel; she did not state that the officers were interacting with hospital personnel or whether the officers appeared to be involved with the hospital personnel's actions. Without any other evidence in the record to show that Spencer's blood was drawn at the request of the police, we conclude the trial court abused its discretion when it concluded the hospital personnel acted in concert with and were agents of the police officers. We sustain the State's second issue.

We reverse the trial court's order granting Spencer's motion to suppress and remand this cause for further proceedings. Based on our resolution of the State's second issue, we need not address the State's first issue. *See* TEX. R. APP. P. 47.1.


/Ada Brown/
ADA BROWN
JUSTICE


Do Not Publish
TEX. R. APP. P. 47

131210F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-13-01210-CR      V.

TYRAN DIONNE SPENCER, Appellee

On Appeal from the County Criminal Court
No. 1, Dallas County, Texas
Trial Court Cause No. MB12-55346.
Opinion delivered by Justice Brown.
Justices Lang and Myers participating.


Based on the Court's opinion of this date, the trial court's order granting appellee Tyran Dionne Spencer's motion to suppress is **REVERSED** and the cause **REMANDED** for further proceedings.


Judgment entered this 23rd day of June, 2014.


/Ada Brown/
_____
ADA BROWN
JUSTICE