ACCEPTED
13-14-00123-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
10/5/2015 8:31:47 PM
Dorian E. Ramirez
CLERK

CAUSE NOS. 13-14-00123-CR

IN THE COURT OF APPEALS FOR THE
THIRTEENTH DISTRICT
AT CORPUS CHRISTI, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
10/5/2015 8:31:47 PM
DORIAN E. RAMIREZ
Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RAUL LARA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL OF CAUSE NO. CR-4394-12-E
FROM THE 275TH DISTRICT COURT
OF HIDALGO COUNTY, TEXAS
HONORABLE JUAN PARTIDA, PRESIDING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMENDED BRIEF FOR APPELLANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Rolando Garza
310 W. University
Edinburg, TX 78539
Bus: (956) 318-1102
Fax: (956) 381-5005

Counsel for Appellant

CAUSE NO. 13-14-00123-CR
IN THE COURT OF APPEALS FOR THE
THIRTEENTH DISTRICT
AT CORPUS CHRISTI, TEXAS

RAUL LARA,                                          APPELLANT
V.
THE STATE OF TEXAS,                                 APPELLEE

IDENTITY OF PARTIES AND COUNSEL

The undersigned attorney submits that the listed individuals are parties

and/or counsel to the instant case:

(1)    The Appellant in this case is Raul Lara;

(2)    Appellant is represented on appeal by Rolando Garza, 310 W.
       University, Edinburg, Texas 78539;

(3)    Appellant was represented in the lower court by O. Rene Flores, 1308 S.
       10th Ave., Edinburg, Texas 78539 and Judith Pena-Morales, 120 S. 12th
       Street, Edinburg, Texas, 78539;

(4)    Appellee is the State of Texas represented by the Hidalgo County
       District Attorneys office.

(5)    Appellee is represented on appeal by Theodore C. Hake, 100 N.
       Closner, Edinburg, Texas 78539.

(6)    Appellee was represented in the lower court by Assistant Hidalgo
       County District Attorneys Bobby Lopez and Heather Reeve, 100 N.
       Closner, Edinburg, Texas 78539.

                             Respectfully Submitted,

                             /s/Rolando Garza
                             Rolando Garza

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ......................…………...………….……..........................................2

NOTE REGARDING FORM OF CITATION TO RECORD ......................……........3

STATEMENT OF THE CASE ......................……......…………….….............................................4

ISSUES PRESENTED ..................................................................................4

STATEMENT OF FACTS ......................…………….………......………….....…5

SUMMARY OF ARGUMENT .......................................................................14

ISSUE PRESENTED WITH ACCOMPANYING
  ARGUMENT ON SAME PAGE

(1)  The jury charge contains egregious error .............................................15

(2)  The trial court erred in not suppressing the statements.......................................24

9.4 CERTIFICATION .....................................................................................40

CERTIFICATE OF SERVICE ......................................……...................…….................40

# INDEX OF AUTHORITIES

CASES

*Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1984) ........................................17

*Amador v. State,* 221 S.W.3d 666 (Tex.Crim.App. 2007) ...........................................24

*Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991) ...................................30,33

*Garcia v. State*, 919 S.W.2d 370, 379 (Tex. Crim. App. 1994) ..........................30,31

*Herron v. State*, 86 S.W.3d 621 (Tex.Crim.App. 2002) .............................................18

*Johnson v. State,* 68 S.W.3d 644 (Tex.Crim.App. 2002) ...........................................24

*Joseph v. State*, 309 S.W.3d 20 (Tex.Crim.App. 2010) ..............................................29

*McIntosh v. State*, 297 S.W.3d 536
(Tex. App.—Houston [1st Dist.] 2009, *pet. ref'd*) .......................................................16

*Herron v. State*, 86 S.W.3d 621 (Tex.Crim.App. 2002) .............................................18

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) .........................27,28,29,34

*Missouri v. Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601 (2004) .........................27,38

*Montanez v. State,* 195 S.W.3d 101 (Tex.Crim.App. 2006)........................................24

*Ngo v. State*, 175 S.W.3d 738 (Tex.Crim.App. 2005) .................................................16

*Oursbourn v. State*, 259 S.W.3d 159 (Tex.Crim.App. 2008) .....................................28

*Saunders v. State*, 817 S.W.2d 688 (Tex.Crim.App. 1991) .......................................18

*Smith v. State*, 332 S.W.3d 425 (Tex.Crim.App. 2011) ..........................................16,17

*State v. Owen*, 2014 Tex. App. LEXIS 5680,
(Tex. App. Corpus Christi May 29, 2014) ........................................................26

*Vasquez v. State*, 411 S.W.3d 918 (Tex. Crim.App. 2013) .........................................26

*Wiede v. State,* 214 S.W.3d 17 (Tex.Crim.App. 2007) ...............................................24

*Wilkerson v. State,* 173 S.W.3d 521 (Tex.Crim.App. 2005) .......................................29

*Williams v. State*, 84 S.W.3d 243
(Tex.App.—Tyler 2002, pet. granted, judgm't vacated for lack of jurisdiction)....34,36

### NOTE REGARDING FORM OF CITATION TO RECORD

Review of the appellate record indicates that it is composed of a one volume clerk's record and approximately twelve volumes of reporter's record. In the interest of clarity and brevity, the volumes will be referred to in this brief as follows:

<u>TITLE</u>                                        <u>DESIGNATION</u>

Clerk's Record ......................……………….......….. "CR"

Reporter's Record......…………...…………….......… by date, page numbers

Designations will be preceded by a volume number or date and followed by a page number.

Exhibits will be referred to by exhibit number.

## STATEMENT OF THE CASE

Raul Lara was indicted with one count of murder. (CR-1) Raul was found guilty by a jury as charged in the indictment. (CR-261) On December 19, 2013 the jury sentenced Raul to fifty-five years in the Institutional Division of the Texas Department of Criminal Justice. (CR-262-266)

A timely notice of appeal was filed on January 9, 2014. (CR-279) decision

## ISSUES PRESENTED

(1) The jury charge contains egregious error.

(2) The trial court reversibly erred in not suppressing the statements.

STATEMENT OF FACTS

Antonio Navarro, testified that he was hanging out at a friends house across the street from where he lived; that there were quite a few people present; that they were outside in a vacant lot; that he heard an argument; that two girls ended up leaving the party; that he was standing by a truck when a van came by and stopped; that the drivers side window was facing him; that the backside door opened; that there was a young gentleman there talking; that his friend "JP" was responding; that JP was asked "Are we cool?"; that JP responded "Yeah, we're cool" and took a step back; that someone then pulled out a gun; that he and others then ran to the front of the truck; that he heard around eight shots; that it was dark and, "You can't really see faces"; that after the van left, he saw "Miguel's car a little bit more down the street stopped"; that Miguel got "caught in the cross fire"; and that he could not identify Raul Lara as the shooter. (12-13-13, pp. 6-21)

Crystal Trevino testified that she was also at the party; that Julissa and Lucinda were told to leave the party in no kind words; that they left walking; that a van then came by that she recognized as the one that would pick up Julissa and Lucinda at school; that she thinks the two are cousins; that someone from the van "opens the side door, and tells the people that are with us that they better not be messing with his cousins"; that she was sitting on the tailgate of the truck even while the shooter

5

approached with the gun; that the guy who made the comment about the cousins was the same person with the gun and was also holding a rag; that Jamika pushed her out of the way; that she ended up at the front of the truck along with a bunch of other people; and that she could not identify the shooter. (12-13-13, pp. 24-35)

Alvaro Guerra testified that he was at the party; that, as to the shooting, "When I saw him pull out the pistol, I noticed how JP reacted to it. And I see him take a few steps back like going to run. And that's what I heard that the man, the individual, just cocked the gun. And when I heard him cock the gun, he also threw like a sort of like a towel or something over it. And when he did that, that's what I noticed JP run"; and that at no time did he identify Raul Lara as the shooter. (12-11-13, pp. 48-55)

Jamika Duncan testified that she was at the party; that she saw the van pull up; that she thought something was going to happen; that she heard a guy "saying like to leave their cousin alone"; that the first shot went off when she was walking around the truck; that she grabbed her best friend and just turned around; that she did not get a good look at the shooter; and that she was told by her best friend that the shooter also had a rag. (12-13-13, pp. 36-50)

Jamika also testified that she texted Julissa after that night to find out what happened; that Julissa was blaming it on Lucinda, "saying that she was the one mad, that she had told everybody like to go do something"; and that Lucinda was "pissed"

6

because she got kicked out of the party. (12-13-13, pp. 43,48) Jamika also testified that Julissa initially denied being in the van but then admitted that she was. (12-13-13, p. 51)

Andrea Gomez testified that she was at the party; that she was drinking beer and smoking; that everybody was smoking at the party; that she first saw the van drive by real slow and that a male was driving; that the van returned and was driven by Yaritza; that after the van got to the party, "The sliding door was open, and we saw two guys sitting inside the van. And one of the guys had a red rag on his hand. And I automatically knew, like, what it was. And I yelled out that he had a gun so everybody can run"; that two guys were seated in the middle seat; that "JP" was told "I don't want you hanging around with my cousins no more. All right."; that she remembered hearing about seven shots; that a Nick Zapata was rolling marijuana in the car next to a white truck; that the car was facing away from the street; that Nick was facing forward; and that Nick was not a position to see what was in the van or what happened. (12-13-13, pp. 52-65)

Jasmine Villegas testified that she was at the party; that she could not see the faces of the people in the van other than Yaritza, who was driving on the second pass; vacillated as to whether Eric Atwood a/k/a "Negro" was driving the van on the first pass; that Negro was always with Yaritza; that she was sure that Negro was the one who

7

said "Stop messing with my cousins"; that when she heard Negro speak, she saw a gun, in a rag, in his hand; that she recognized his voice since, "They were my ride to school, after school every day"; that she did not see Raul Lara that night; and that the first time she had seen Raul Lara was that day in the courtroom. (12-13-13, pp. 68-86)

Jasmine also recalled a telephone conversation she had with Julissa on speaker phone in which Julissa admitting instructing to shoot but not to shoot at her friends. (12-13-13, pp. 87-88)

Investigator Ileana Pena testified that she initially had arrest warrants for Yaritza Tijerina and her husband Eric Atwood a/k/a "El Negro"; that surveillance was conducted on the Tijerina residence/ranch; that the Tijerina family consisted of Yaritza, Lucinda, Julissa, and Eric Atwood; that when the investigators arrived at the ranch, Eric Atwood had fled; that Jasmine, who was at the party and knew Eric Atwood, identified him as the shooter; that Lucinda led her to believe that Jorge Caballero/George was the shooter; that in her affidavit, Lucinda did not mention Raul Lara; and that Raul Lara was never identified in a photo line-up. (12-12-13, pp. 126-136)

Investigator Eduardo Ruiz testified that he took a statement from partygoer Nicholas Zapata and that he could neither provide a name for the shooter nor could he give a good description of the shooter. (12-12-13, pp. 187-188)

Nicholas Zapata said that he was at the party; that he was smoking marijuana; that the girls that came to the party brought the marijuana; that a van pulled up; that they got off and started talking to JP; that he was sitting in a car with his leg halfway out; that he was looking back; that he could see towards the van but not inside the van; that he did not recognize anyone from the van; that he saw one person get out of the van and start shooting; that "As soon as I saw the gun, I just ducked down"; that he later saw police reports with pictures of people who had been arrested; and claimed that he then recognized Raul Lara as the shooter. (12-13-13, pp. 92-105)

Nicolas then testified that when he first spoke to the police, he did not give much of a description of the shooter since he was in shock and high from smoking weed; that all he told the police was that the shooter had a goatee and white cap; that it was dark; that when the shooting started, he had already smoked weed; that he was in the car listening to music; then claimed that when the van pulled up, "I turned around and stepped out"; that "You can't give a description of a face"; that "I recognized his face as soon as I saw it on the news"; that "when they arrested him, they asked me if that was him. And I said yes"; that he saw Raul Lara on the news and in the newspaper; that he knew that Raul had been fingered as the shooter; agreed that somebody needed to pay for this shooting; and that he was never shown a photo line-up with Raul Lara in it. (12-13-13, pp. 106-126)

9

Rogelio Torres testified that he was smoking marijuana before the van arrived; that he did not recognize the van; that someone started saying something to JP; that when he heard the gun being cocked, he ran to the back of the truck; that from the van he heard one voice; that the shooter had a white shirt, cap, goatee, and tattoos on his arms; that "It was dark. I couldn't see his face. Technically, I couldn't see his face"; that he was never given a photo line-up to look at; that he was shown pictures in the future; that the police told him who was the shooter; and responded in the affirmative when asked "You were told this person is the shooter? Is this him?". (12-13-13, pp. 133-152) Rogelio was not asked to do an in court identification of Raul Lara as being the shooter. (12-13-13, pp. 133-153)

Christian Zapata said that the deceased was his brother-in-law; that a guy came out of the van and started arguing with JP to "stop chilling with his cousin"; that he had not seen him before; that he was wearing a black cap, with a white tee, and blue jeans; that he had a white towel wrapped around a gun; that when the shooting started he ran to the back of his mom's house; that the shooter was skinny, in his 20's, with a goatee and tattoos; that as to the middle seat of the van, he could only see shadows; that he was not shown Raul Lara in a photo line-up; that he saw news reports; that he did not remember if he saw the shooter in the first reports; that a police officer showed him a newspaper with Raul Lara's picture in it; that the police told him which people had been

10

arrested; that he then recognized Raul Lara as the shooter; that the same person who was holding the towel would be the same person who had the gun; and that Raul "looks like" the same guy that came out of the van. (12-13-13, pp. 153-170) He was also not asked to make an in court identification of Raul Lara as being the shooter.

Ivan Lopez testified that the deceased was his best friend; that he did not get a good look at the shooter; that "it was too dark for me really to point him out specifically"; that the shooter had a short face, short hair, dark complected/caramel like, and "like a goatee"; and that he could not identify Raul Lara as the shooter even though he was in the deceased's vehicle with the head lights on. (12-13-13, pp. 173-186)

Martin Zapata testified that only one person came out of the van; that he did not know who it was; eventually admitted that when he first spoke with the police that the only description he gave of the shooter was that he wearing a white T-shirt and blue jeans; that after seeing news reports, he added to his description of the shooter as being in his 20's, a black cap, tattoos on his arm, and a goatee; that after seeing news reports, he recognized Raul Lara as the shooter; that Edinburg Police Department "showed us pictures. But they weren't the line-up. And it wasn't them. So I identified him on the newspaper. They had a picture of him"; and that today, he added that the shooter was skinny and young. (12-13-13, pp. 188-205)

11

Juan Pablo Sosa, Jr., said that he was also know as "JP"; that he was smoking marijuana on the night in question; that he was the closest person to van; that the back door slid open; that "the one that's in front of us, he told us not - - to stop chilling with his cousins"; that there was another voice coming from the van; that someone handed the shooter a weapon; that the weapon is wrapped in a white towel; that he couldn't really see the weapon; that he took a couple of steps back and ran towards the front of the truck; that he heard shots; that he did not look back; that he had not seen the shooter before; that he later saw news coverage of Raul Lara being arrested; that he recognized him in the newspaper; that he had no reason as to why he waited three weeks to go tell the police; that on the night of the shooting he told the police that the shooter had a little mustache; that there was a difference between a mustache and a goatee; and that smoking marijuana has no affect on him. (12-13-13, pp. 214-240)

Investigator Arnoldo Izquierdo testified that in his report he noted that JP Sosa was shown two photo line-ups, one of Little Bear, Leonardo Moreno, and of Raul Lara; that JP Sosa was unable to identify anyone from the line-ups; and that today he was saying that Raul Lara was not in the line-ups. (12-12-13, pp. 244-245)

Stevie Ray Aguilar testified that he was as at the "get together"; that a van passed by and then returned; that one of the individuals in the van said "something that do not be messing with my prima"; that he heard "the individual, just cocked the gun. And

12

when I heard him cock the gun, he also threw like a sort of like little towel or something over it"; that they were under a couple of lamps so there was good lighting conditions and could see pretty good; that people scattered; that the shooting began; and that at no time had he identified Raul Lara as the shooter. (12-11-13, pp. 38-55)

Officer Joseph Anthony Lucio testified that he responded to a call for shots fired in the present case; that he did field interviews; that there was no one at the location that named Raul Lara as the shooter; and that no one gave him a description of the shooter. (12-11-13, pp. 67-76)

Investigator David Valdez testified that he recovered a towel from the suspect vehicle/van; that he found it between the second and third row seats; and that he submitted the towel for testing. (12-11-13, pp. 176-179)

Doctor Vanessa Nelson, the section supervisor for the DNA analysis section for the Texas Department of Public Safety Crime Lab in Weslaco, testified that a towel from the present matter was submitted to her for DNA analysis; that the DNA found on the towel was compared to known saliva samples from Raul Lara, Jr., Leonardo Moreno, Eric Atwood, and Martin Tijerina, Jr.; and she was able to exclude Raul Lara, Jr., Leonardo Moreno, and Martin Tijerina, Jr.; and that the DNA on the towel came back to "Eric Atwood, and a mixture of somebody else. But as far as Lara, Moreno and Tijerina, it is not their DNA on there." (12-12-13, pp. 37-50)

13

## SUMMARY OF ARGUMENT

The jury charge contains egregious error since the jury was instructed to pass over the issue of whether two key witnesses were accomplices as a matter of fact when they were accomplices as a matter of law.

The trial court reversibly erred in not suppressing Raul statements since they were obtained in violation of Criminal Procedure Article 38.22, *Miranda v. Arizona*, *Missouri vs. Seibert*, the Fifth Amendment to the United States Constitution, and was obtained in violation of constitutional rights to have a knowingly, intelligently and voluntary statement. Prior to interrogation, there was no effectual waiver of *Miranda* rights.

## FIRST ISSUE PRESENTED

The jury charge contains egregious error.

## ARGUMENT AND AUTHORITIES IN SUPPORT OF
## THE FIRST ISSUE PRESENTED

The jury was instructed as follows:

Upon the law of accomplice witness testimony, you are instructed that a person who has participated with someone else before, during or after the commission of a crime is an accomplice witness. In such cases, there must be some evidence of an affirmative act on the witness' part to assist in commission of the offense. If the witness cannot be prosecuted for the offense with which the accused is charged, then the witness is not an accomplice witness as a matter of law. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it. The witness's presence at the scene of the crime does not render that witness an accomplice witness.

Now, if you find from the evidence that Lucinda Tijerina was an accomplice, then you are further instructed that you cannot convict the Defendant upon Lucinda Tijerina's testimony, unless you first believe that her testimony is true and shows the guilt of the Defendant as charged in the indictment, and then you cannot convict the Defendant unless Lucinda Tijerina's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged.

Now if you find from the evidence that Julissa Tijerina was an accomplice, then you are further instructed that you cannot convict the Defendant upon Julissa Tijerina's testimony, unless you first believe that her testimony is true and shows the guilt of the Defendant as charged in the indictment, and then you cannot convict the Defendant unless Julissa Tijerina's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged.

15

The corroboration of an accomplice witnesses' testimony is not sufficient if it merely shows the commission of an offense, but it must tend to connect the Defendant with its commission, and then from all the evidence, you must believe beyond a reasonable doubt that the Defendant is guilty of the offense charged against him, or if you have a reasonable doubt thereof, you will acquit the defendant.

You are further instructed that one or more accomplices cannot corroborate each other. Such corroborative evidence, if any, must be from some source other than said accomplices, Lucinda Tijerina and Julissa Tijerina, or either of them, as herein charged.

(CR-254-256)

The jury was instructed to determine if Lucinda and/or Julissa were accomplices as a matter of fact versus being instructed that both or either were an accomplice as a matter of law.

The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice; "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011).

A trial court must instruct a jury by "a written charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. Ann. art. 36.14; *see McIntosh v. State*, 297 S.W.3d 536, 542 (Tex. App.—Houston [1st Dist.] 2009, *pet. ref'd*). In analyzing a jury charge issue, it is first determined whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If error is found, an appellate court will

16

then analyze the error for harm. *Id*. The degree of harm necessary for reversal depends on whether the defendant preserved the error by objection. *Id*. Reversal is required for a jury charge error when the defendant has properly objected to the charge and an appellate court finds "some harm" to his rights. *Id*. (*citing Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)). When the defendant fails to object, or states that he has no objection to a charge, an appellate court will not reverse for charge error unless the record shows "egregious harm" to the defendant. *Id*. at 743-44. Thus, charge error is reviewed by considering whether (1) error exists in the charge and (2) if so, whether sufficient harm resulted from the error to require reversal. *Id*. at 744.

An accomplice is a person who participates before, during, or after the commission of an offense, with the requisite culpable mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011). Presence at a crime scene alone does not make a person an accomplice; rather, an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed. *Id*. A witness may be considered an accomplice as a matter of fact or as a matter of law. *Id*. If the evidence is conflicting as to whether a witness is an accomplice, then the trial court may instruct the jury to determine the witness's status as a fact issue. *Id*. at 439-40. When the evidence clearly shows that a witness is an accomplice as a matter of law, however, the court must instruct the jury accordingly. *Id*. at 439.

17

"A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Id*. If the State dismisses the indictment before the witness testifies, the witness is no longer deemed to be an accomplice as a matter of law. *Id*. "A witness continues to be regarded as an accomplice, however, if the witness agrees to testify against the accused in exchange for the dismissal of the charge." *Id*.

"[T]he omission of an accomplice witness instruction is generally harmless unless corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex.Crim.App. 2002) (*quoting Saunders v. State*, 817 S.W.2d 688, 689 (Tex.Crim.App. 1991)).

As noted previously, Jasmine testified about a telephone conversation she had with Julissa in which Julissa admitting instructing to shoot. (12-13-13, pp. 87-88) Julissa Tijerina was represented by attorney Rubio Salinas. (12-16-13, p. 7)

Prior to testifying, the State put on the record that Julissa was offered immunity in exchange for her testimony "regarding the murder that happened October 5, 2012, and her alleged involvement in that murder and any other involvement that she may have had in the aftermath of the murder related to that murder." (12-16-13, p. 25-26)

18

Regarding the shooting, Julissa said that when the van stopped, Leonardo a/k/a/ Little Bear opened the sliding door; that Leonardo told the people at the party to "not hang out with us"; that Raul did not tell the people anything; that "Raul just sticks one leg out and starts shooting"; that Leonardo then "sticks out a gun and starts shooting"; that she heard ten or eleven shots; that they close the door to the van and leave fast; that Raul said the shooting was fun and looked happy; that Raul said he had two bullets left; that Raul and Leonardo picked up the bullet casings that were in the van; that Yaritza told her to tell the police that the shooter was someone named George; that she did not do so; that she was arrested and taken into custody for these charges; and that she was offered immunity in the present murder. (12-16-13, p. 100-112)

During a hearing in the present matter, the State noted a list of co-defendants to include Eric Atwood, Lucinda Tijerina, Leonardo Moreno, and Martin Tijerina. (12-16-13, p. 12) Lucinda Tijerina was represented by attorney Abiel Flores. (12-16-13, p. 8) During cross-examination, Lucinda testified that both she and her cousin Julissa had been arrested on murder charges. (12-16-13, p. 79)

Lucinda testified that Yaritza Tijerina was her sister; that Martin Tijerina was her brother; that Yaritza was married to Eric Atwood a/k/a "Negro"; that Julissa Tijerina was her cousin; that she knew Leonardo Moreno a/k/a "Little Bear" for about four years; and that she knew Raul Laura since she was little. (12-16-13, pp. 36-39)

19

Lucinda further testified that on the night in question, she was smoking weed at her friend's Andreas house; that everyone there was smoking weed; that she had previously took two Xanax pills at school; that she went to party along with the girls that were at Andreas house; that she did not have permission to go to the party; that there were twenty to thirty people at the party; that they were outside in a lot; that she was drinking, smoking, and taking pills at the party; that the guys told her to leave the party because she was a minor; that she was unable to find a ride from someone at the party; that she began walking; that her sister picked her and Julissa up at a stop sign in a van driven by Eric; that Yaritza was in the front passenger seat; that Raul and "Little Bear" were in the middle seat; that Raul was behind Eric; that Little Bear was behind Yaritza; that Martin was in the backseat; that she went to sit by the window in the very back seat; that instead of heading home, they went by the party; that they made a U-turn; that everybody remained in their seats; and that they then stopped at the party. (12-16-13, pp. 39-56)

Lucinda then said that Raul opened the door; that Little Bear started "telling them like not to hang around with us no more"; that Raul said something similar; that Raul and Little Bear started shooting at the same time from inside the van; that she saw two guns; that they both had guns; that she saw about twenty people running; that she heard about eight or nine shots; that they drove off; that Raul was telling Little Bear that he

hadn't done that in long time; that they went to her mothers house; that Raul, Little Bear, Negro, and her sister started searching the van; that Yaritza told her to tell the police that the shooter was someone named George; that she did tell the police that George was the shooter; and that in exchange for her testimony, the State had agreed not to prosecute her for anything she may have done in connection with this murder. (12-16-13, pp. 55-70)

Juveniles Lucinda and Julissa were implicated in instigating the retaliatory shooting. (12-13-13, pp. 43,48) (12-13-13, pp. 87-88) They were both susceptible to prosecution. Both Lucinda and Julissa were charged and arrested with the present murder. Subsequently, both were granted immunity in exchange for their testimony. They were accomplices as a matter of law. The jury should have been charged accordingly. Instead, the jury was instructed to determine whether Lucinda and Julissa were accomplices as a matter of fact.

The omission of the correct accomplice instruction was extremely harmful and amounted to egregious error/ the non-accomplice evidence was so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. *Saunders v. State*, 817 S.W.2d 688, 689 (Tex. Crim. App. 1991).

First, the accomplice issue was heavily contested. In closing argument, the State stressed Lucinda's and Julissa's testimony to fill in the gaps and further stressed that

21

they were not accomplices. The State argued that the State did not have to prove that the bullet came from Moreno's gun or Lara's gun because Lucinda said both were shooting (12-17-13, pp. 28-29); that there was no affirmative act taken by Lucinda or Julissa (12-17-13, p. 32); that Julissa was unwavering as to her version of events, unlike other witnesses (12-17-13, pp. 101); and that "The only people that have any protection in the van were Lucinda and Julissa. And they told you who the shooters were" (12-17-13, pp. 104-15).

The defense strongly stressed to the contrary by making such arguments that blood was thicker than water/that Lucinda and Julissa were shielding their relatives by claiming non-relatives were the shooters (12-17-13, pp. 51); that the State wanted the jury to ignore the accomplice witness instruction (12-17-13, pp. 28-29); stressed the principle that the jury could not convict on accomplice witness testimony, "unless you first believe that here testimony is true, and shows his guilt as charged in the indictment. And then you can cannot convict him unless her testimony is corroborated by other evidence tending to connect him with the offense. That's a lot of hurdles to get through. And the reason they want you to ignore it because they want you to believe what they say without questioning" (12-17-13, pp. 64).

The jury requested to view the statements of Julissa Tijerina and Lucinda Tijerina to all of the questions asked by the defense attorneys. (12-18-13, pp. 8-11)

22

Julissa and Lucinda's testimony was the cornerstone of the State's case. Without that testimony, the State was left with such scenarios as having one versus two shooters; having DNA on a towel, found in the suspect van and allegedly used in the shooting, come back to one shooter, Eric Atwood a/k/a "El Negro" who was related to Julissa and Lucinda; having someone familiar with Eric Atwood identifying him as the shooter; having people identify Raul as the shooter from overly suggestive news reports versus a photo line up; having a possibly missing photo line up which contained Raul's photo but that no one identified; having people who gave vague descriptions of the shooter now adding to their descriptions after having seen overly suggestive news coverage; having statements from Raul that he was not the shooter; having a case where the voluntariness of Raul's statements was an issue for the jury to decide (CR-253); a case where the police told Raul to make a statement or go down for murder; and a case where the shooter told people to not be messing with his cousins Julissa and Lucinda; to whom, Raul is not related.

The non-accomplice evidence was so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. Also by allowing Julissa and/or Lucinda to be found to be mere fact witnesses, the jury was allowed to convict on either of their testimony alone.

A new trial is needed.

23

## SECOND ISSUE PRESENTED

The trial court erred in not suppressing the statements.

## ARGUMENT AND AUTHORITIES IN SUPPORT OF
## THE SECOND ISSUE PRESENTED

A trial court's ruling on a motion to suppress evidence is reviewed under a bifurcated standard of review. *Amador v. State,* 221 S.W.3d 666, 673 (Tex.Crim.App. 2007). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State,* 214 S.W.3d 17, 24–25 (Tex.Crim.App. 2007) Almost total deference is given to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor; and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador,* 221 S.W.3d at 673; *Montanez v. State,* 195 S.W.3d 101, 108–109 (Tex.Crim.App. 2006); *Johnson v. State,* 68 S.W.3d 644, 652-653 (Tex.Crim.App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador,* 221 S.W.3d at 673; *Johnson,* 68 S.W.3d at 652-653.

Investigator Ileana Pena testified that Raul was in custody at the time he was interrogated; that Raul was handcuffed and not free to leave; that State Exhibit 1 is the

Miranda warnings and Waiver of Rights form; that in the "Warning" section, she put "X"s where she had Raul put his initials; that the middle of the page had a "Waiver" section; that the Waiver section did not include the words "knowingly", "voluntarily", nor "intelligently"; agreed that in State's Exhibit 1 that, "there is no knowing, intelligent and voluntary Waiver of Rights"; that there was an audio of Raul being interrogated; and agreed that "at no time, in any form did Edgar Ruiz (another investigator), or yourself for that matter, ask Mr. Lara: Do you knowingly, intelligently and voluntarily waive your rights".  (12-6-13, pp. 19-23)

The waiver, later introduced at trial as State's Exhibit 83 reads:

I have read this statement of my rights (this statement of my rights had been read to me) and I understand what my rights are.  I am willing to discuss subjects presented and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing.  No promise or threats have been made to me and no pressure or coercion of any kind has been used against me.

(State's Exhibit, 83)

As to State's Exhibit 2 (Statement of Accused), Ileana Pena testified that Raul initialed and signed the form; that the interrogation lasted a little less than two hours; that the written statement was about four sentences long; that the statement was a summary; that the statement was typed after the interrogation; that a witness was present

25

at the time that Raul signed State's Exhibit 2; and agreed that Raul did not initial nor sign the Statement of Accused until after he was interrogated. (12-6-13, pp. 23-26)

State's Exhibit 2, later introduced at trial as State's Exhibit 84, contains an express waiver that "I understand my rights as set out above. I knowingly and voluntarily waive such rights and freely and voluntarily make the following statement without compulsion or persuasion." (State's Exhibit, 84)

Ileana Pena also testified that she told Raul something to the effect that they had already talked to everybody; that they all said he did it; that he may as well say what happened; and that unless he talked, he was going down for this. (12-6-13, p. 35)

Sergeant Orlando Garcia testified that he interrogated Raul the day after he was interrogated by Ileana Pena and Edgar Ruiz; that "They wanted me to go further questioning to see if we can get more of - - or see if he placed himself in the vehicle that was used during the homicide"; that he obtained a statement from Raul (State's Exhibit 5); and he questioned Raul for about fifty minutes; that the statement was a summary; that he typed up the summary; and that State's Exhibit 5 was not generated until after Raul was interrogated. (12-6-13, pp. 37-54) Sergeant Garcia employed the same forms as did Ileana Pena.

After the presentation of evidence/testimony, defense counsel challenged the admissibility of Raul's statements as being obtained in violation of Texas Code of

Criminal Procedure Article 38.22; being obtained in violation of *Miranda*; being obtained in violation of constitutional rights to have a knowingly, intelligently and voluntary waiver of rights; being obtained in violation of *Missouri vs. Seibert*; the product of Raul being told to simply sign waivers instead of being given a choice; the product of Raul being coerced by such threats that if he did not talk that he was going down for the murder; obtained in violation of the Fifth Amendment to the United States Constitution; that the waivers were not signed by witnesses; and the overall voluntariness of the statements. (12-6-13, pp. 81-107) Defense counsel also requested that the court consider all of the statutory and constitutional provisions cited in the Motion to Suppress. (12-6-13, pp. 98) Defense counsel also filed a Memorandum in Support of Defendant Lara's Motion to Suppress Statement of Accused. (CR-223-232)

The trial court stated it would consider everything that was presented that morning. (12-6-13, pp. 81-97)

The trial court subsequently denied suppression of the statements noting it had reviewed the evidence, the arguments, and filings of counsel. (12-9-15, pp. 5-6)

During the course of trial, defense counsel objected to the introductions of Raul's statements. (12-12-13, pp. 110-112, objections to statement/States Exhibit 84 were overruled ) (12-12-13, pp. 210, objections to statement/States Exhibit 86 overruled)

Raul's initial statement noted that he did not remember anything about the

27

shooting.  (12-12-13, pp. 113-114)  In the second statement, Raul places himself in the van and says that he was the one that opened the door to the van; that "Little Bear" began getting rowdy with the people at the party; that Little Bear then pulls out a gun from his waist and begins shooting; that he then closed the door to the van; that Little Bear was "pretty barred out"; and that "when they got to my house they started looking for bullets inside the van".  (12-12-13, pp. 210-216)

*Lara's written statements do not comply with Article 38.22.*

A written statement of an accused given while in custody must, under Texas Code of Criminal Procedure article 38.22, § 2(b), expressly show on the face of the document that "prior to and during the making of the statement," the defendant waived his rights under that provision. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b). "Article 38.22 is aimed at protecting suspects from police overreaching." *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex.Crim.App. 2008).  But it goes further than the Due Process Clause and *Miranda v. Arizona*—the inquiry of a knowing, intelligent, and voluntary waiver under article 38.22 § 2(a) does not "turn solely on police overreaching. The behavior of the police may or may not be a factor." *Id.*

Here, Investigator Pena testified that she told Raul something to the effect that they had already talked to everybody; that they all said he did it; that he may as well say what happened; and that unless he talked, he was going down for this.  (12-6-13, p. 35)

28

Once the defendant proves a custodial interrogation, the State bears the burden of demonstrating compliance with article 38.22 § 2(b) by a preponderance of the evidence. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010); *see Wilkerson v. State,* 173 S.W.3d 521, 532 (Tex. Crim. App. 2005) ("The mere filing of a motion to suppress does not thrust a burden on the State to show compliance with Miranda or article 38.22 warnings unless and until the defendant proves that the statements he wishes to exclude were the product of custodial interrogation."). Here, Raul's interrogations were custodial. Thus, article 38.22, § 2 was invoked, and the State bears the burden to demonstrate compliance by a preponderance of the evidence. *Joseph*, 309 S.W.3d at 24; *Wilkerson*, 173 S.W.3d at 532.

Here, the police failed to comply with article 38.22, § 2(b), by failing to obtain an express waiver "prior to" obtaining a statement from Raul. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b). And merely agreeing to speak with police officers after being advised of *Miranda* rights does not "substantially comply," as a matter of law, with the statute's express waiver requirement.

Article 38.22, § 2 provides:

> Sec. 2. No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding **unless it is shown on the face of the statement** that:

(a)     the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

(1)     he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2)     any statement he makes may be used as evidence against him in court;

(3)     he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)     if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)     he has the right to terminate the interview at any time; and

(b)     ***the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.***

Tex. Code Crim. Proc. Ann. art. 38.22, § 2 (emphasis added).

The Court of Criminal Appeals, in *Garcia v. State*, held that article 38.22, § 2(b) is "clear and unambiguous, and 'the Legislature is *constitutionally entitled* to expect that [we] will faithfully follow the specific text that was adopted.'" 919 S.W.2d 370, 379 (Tex. Crim. App. 1994) (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). "Under art. 38.22, § 2(b) the written statement must show *on its face* the knowing, intelligent and voluntary waiver of each of the rights of art. 38.22, § 2(a)." *Id.*

30

The statute also clearly requires that the waiver be made "*prior to and during*" the making of the statement. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b).

In *Garcia*, the defendant contended that the police form he signed did not contain an express waiver of rights. 919 S.W.2d at 379. The State, in turn, argued that because the defendant initialed next to each right provided, he waived those rights. *Id.* The Court of Criminal Appeals held that the judge's finding of waiver was not supported by the record, and that "[t]he trial judge's findings cannot change what is readily apparent (or more appropriately, lacking) from the face of the written statement." *Id.* The Court held that the defendant, by merely initialing each warning, "did not affirmatively *waive* the rights contained in the warnings. At best, appellant's initials only indicated that he read and understood those warnings." *Id.* The Court noted that the detective who interrogated the defendant testified that he "had [appellant] read those rights" and then told him "if he *understood* them I wanted him to initial them, which he did." *Id.*

The Court then addressed a paragraph at the end of the waiver form, which the State interpreted as a waiver. *Id.* That paragraph stated:

> I have read each page of this statement consisting of [# omitted] page(s), each page of which bears my signature, and corrections, if any bear my initials, and I certify that the facts contained herein are true and correct. I further certify that I have made no request for the advice or presence of a lawyer before or during any part of this statement, nor at any time before it was finished did I request that this statement be stopped. I also declare that I was not told or prompted what to say in this statement.

31

*Id.* at 378-79.

The State argued that while this final paragraph did not contain the word "waiver" and did not address all the rights listed in article 38.22, § 2(a), it substantially complied with § 2(b)'s waiver requirement. *Id.* at 379. Initially, the Court of Criminal Appeals held it need not decide whether substantial compliance would suffice, instead holding that the final paragraph (1) was not an express waiver; (2) did not "convey the knowing, intelligent waiver required by the statute"; and (3) and did not "address each of the rights required to be waived . . . ." *Id.* The Court held that the written statement was "clearly more than 'technical non-compliance with the statute." *Id.* The Court held article 38.22, § 2(b) was a mandatory requirement enacted by the Legislature to address "the defendant's Fifth and Sixth Amendment protections recognized by the Supreme Court of the United States." *Id.* at 379-80. Accordingly, it determined that the trial court erred in admitting the statement. *Id.* at 380.

On rehearing, the Court reversed its holding. *Id.* at 383 (Op. on reh'g). The Court initially noted that the written statement contained the warnings required by article 38.22, § 2(a), but it further noted that the Court had "never ruled what additional language, if any, is required to be included as part of a written statement in order to comply with Article 38.22, § 2(b). *Id.* at 386. The Court noted that the statute "does not provide any guidelines as to the language which might be included as part of a written

32

statement that would constitute a knowing, intelligent and voluntary waiver by the individual of his § 2(a) rights." *Id.* The Court cited *Boykin v. State*, and held that it must determine if the "written statement complies with the Legislature's intent expressed in § 2(b)." *Id.*

The Court did not disturb its initial holding that merely initialing next to the warnings indicated only that the defendant understood his rights. *See id.* at 386-87. However, it reversed its prior ruling based on the additional language in the police form:

> the additional language appearing next to appellant's signature is evidence of reiteration that he understood his rights and knew what he was doing when he gave his statement. Furthermore, the additional language clearly is evidence of knowing, voluntary and intelligent waiver of his right to consult counsel before or during the giving of his statement (Sections 2(a)(3)) and of his right to terminate the giving of his statement at any time (Section 2(a)(5)). Finally, the individual initialing of the paragraphs by appellant pertaining to his right to remain silent and to the likelihood that any statement he made would be used against him in court, when taken into context with the language at the bottom of each page next to his signature, is evidence that he knowingly, voluntarily and intelligently waived the protections afforded appellant by sections 2(a)(1) and 2(a)(2).

*Id.* at 386.

The Court expressed its opinion that the statement was "by no means a model of clarity on this point" and that it was a "close call." *Id.* at 387. It further noted that the trial court found the defendant "orally waived his rights *after* being informed of his rights under *Miranda* . . . and *prior* to giving his written statement." *Id.* However, the

33

record reflects that the defendant was (1) read his *Miranda* rights repeatedly; (2) subsequently confessed, both orally and in writing, to the murders; (3) the oral confessions were videotaped; and (4) a separate written confession was prepared for each offense. *Id.* at 384. Under those facts, the Court refused to disturb the trial court's ruling admitting the written statement. *Id.* at 387.

The Tyler Court of Appeals analyzed *Garcia* and concluded that because the court heavily relied on the final paragraph, it did not alter its decision that merely initialing the warnings constituted a waiver. *Williams v. State*, 84 S.W.3d 243, 247 (Tex. App.—Tyler 2002, pet. granted, judgm't vacated for lack of jurisdiction).[1] "If the contrary were true, the court's analysis of the quoted paragraph would be unnecessary." *Id.* The Tyler Court held that the following statement at the end of the *Miranda* warnings in that case did not substantially comply with article 38.22, § 2(b): "I was further advised that prior to and during the making of a statement that I had to knowingly and voluntarily waive (Give up) the rights that I was advised that I had as set out above." *Id.*

The court held that under *Miranda*, the State must show both a warning and a waiver. *Id.* at 248 (citing *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)). The warning "informs the person in custody in clear and unequivocal terms of his right to remain

---

[1] Although the judgment of the court of appeals was vacated for lack of jurisdiction, the reasoning is still sound and persuasive.

silent and the consequences of forgoing it, his right to counsel, and his right to appointed counsel if he is indigent." *Id.* "The wavier is an intelligent, knowing, and voluntary relinquishment of the rights explained in the warning." *Id.*

The court held that article 38.22 codifies the safeguards prescribed in *Miranda. Id.* It held that the additional language used in Williams's statement was consistent with *Miranda*'s warning requirement, but there was nothing in that statement that showed whether he had intentionally, knowingly, and voluntarily relinquished those rights. *Id.* The court examined the totality of the statement, and the "only suggestion on the face of the statement that Appellant *possibly* waived his rights is that he in fact gave the statement." *Id.* at 249. But the Court in *Miranda* "addressed the issue of presuming waiver of the privilege against self-incrimination and emphasized such a presumption is impermissible under the following circumstances: '[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.'" *Id.* (quoting *Miranda*, 384 U.S. at 475). The court concluded by stating its belief that "the Legislature incorporated the rule expressed by the Court in *Miranda* and did not intend for us to presume waiver from a 'silent statement.' We therefore decline to do so." *Id.* Holding the statement was inadmissible, the court held that article 38.22, § 2 "plainly declares

the inadmissibility of a written statement that does not contain the language of both warning and waiver." *Id*.

The State failed its burden to prove compliance with Article 38.22 because the Warning Form used was not an express waiver, and the waiver in Rauls's later statements came too late.

The statute clearly requires an express waiver "*prior to and during* the making of the statement. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b). The use of the word "and" means the State had to show *both*, which is consistent with *Miranda* and the Legislature's purpose. *See Williams*, 84 S.W.3d at 248. Here, compliance with article 38.22, § 2(b) cannot be supported by the record because while the State may have obtained an express waiver *during or after* the making of the statement, it did not do so *prior to* Raul's statements to the police, as required by article 38.22, § 2(b). TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b).

The Warning Form was signed first. The Warning Form contains a list of the *Miranda* rights, and Lara initialed those, indicating that he understood them. The Warning Form did nothing more than ensure that Lara understood his rights—it was not an express waiver, nor can it be interpreted by the police as an express waiver. This language resembles the "silent record" that *Miranda* and article 38.22 were designed to prevent—"[A] valid waiver will not be presumed simply from the silence of the accused

36

after warnings are given or simply from the fact that *a confession was in fact eventually obtained.*" *See Miranda*, 384 U.S. at 475 (emphasis added); *Williams*, 84 S.W.3d at 249.

The recitation that Raul merely wished to speak with the police after being warned is the same—it is a silent record showing a confession was eventually obtained. Without an express waiver of rights. The State cannot present *any* proof that the Warning Form substantially complied with article 38.22, or that the police even thought it did.

The State must, instead, rely on Raul's statements themselves. While the statements recites a waiver, it fails to satisfy Article 38.22, § 2(b), because the State's own witnesss admitted that the waiver in the statements were made *after* he had already given his confession to the police.

Because the Warning Form did not contain an express waiver, and the waiver in the statements were made *after* he had already given an oral statement to police, the State fails its burden to demonstrate compliance with article 38.22, § (2)(b).

Furthermore any alleged waiver was not intelligently, knowingly, and voluntarily made since it was the product of threats that the police had already talked to everybody; that they all said he did it; that he may as well say what happened; and that unless he talked, he was going down for this. (12-6-13, p. 35)

37

Finally, the practice of getting an ineffectual waiver of rights, followed by questioning, and then the obtainment of an express waiver, as written on the final typed statements, amounts to error under *Missouri vs. Seibert*. *See Missouri vs. Seibert*, 542 U.S. 600 (2004) (In *Seibert,* a plurality of the Supreme Court concluded that a "question first, warn later" interrogation technique circumvents the objectives of *Miranda* by rendering any warnings given ineffective. A "question first, warn later" interrogation technique refers to a strategy in which officers interrogate a suspect without providing *Miranda* warnings and obtain a confession; then, after the inculpatory statements are made, officers provide *Miranda* warnings, obtain a waiver of the warnings from the suspect, and have the suspect repeat the inculpatory statements to cure the initial absence of *Miranda* warnings. *See Seibert,* 542 U.S. 604–605.)

The introduction of the statements was extremely harmful as the State stressed Raul's statements to the jury making such arguments as that even according to Raul, "they" looked through the van to pick up bullet casings (12-12-13, pp. 27-28); that not even Raul says Atwood a/k/a "Negro" was the shooter (12-12-13, pp. 31-32); that "Mr. Lara's own statement puts him in the car" (12-12-13, p. 33); and went into a lengthy narrative preceded by: "I want to talk to you about what we know from the Defendant's own words", to demonstrate guilt. (12-12-13, pp. 38-40)

Raul's statements contradicted in that the first statement claims no knowledge then the second statement placed him in the van. Without the statement placing Raul in the van the State was left with people in the van placing the blame on Raul, who were not related to him and with eye witness identifications that were dubious.

A new trial is needed.

## PRAYER

Wherefore, premises considered, Appellant, prays for that the conviction and sentence be reversed.

Respectfully Submitted,

/s/Rolando Garza
Rolando Garza
310 W. University
Edinburg, TX 78539
Bus: (956) 318-1102
Fax: (956) 381-5005
SBN: 24004665

## 9.4 Certification

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in 9.4(2)(B) is approximately 8,869 words.

/s/Rolando Garza
Rolando Garza

## CERTIFICATE OF SERVICE

I, Rolando Garza, certify that I have mailed or hand delivered a copy of the foregoing brief to Theodore C. Hake, 100 N. Closner, Edinburg, Texas 78539, and to Raul Lara, # 01904469, Stiles Unit, 3060 FM 3514, Beaumont, TX 77705 on October 5, 2015.

/s/Rolando Garza
Rolando Garza