**Opinion filed April 28, 2017**



In The

# Eleventh Court of Appeals

_____

## No. 11-15-00094-CR

_____

## JUSTIN MICHAEL LOWE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. 15261**

## M E M O R A N D U M   O P I N I O N

Justin Michael Lowe was indicted for the capital murder of his young son. The jury acquitted him of capital murder but convicted him of the lesser included offense of felony murder. The jury assessed his punishment at confinement for ninety-nine years in the Institutional Division of the Texas Department of Criminal Justice. In three issues on appeal, Appellant contends that (1) he was deprived of his right to effective assistance of counsel; (2) the trial court abused its discretion in

failing to grant his Motion to Dismiss for Failure to Afford Speedy Trial; and (3) the trial court abused its discretion by allowing testimony concerning Appellant's statements given to a CPS worker who did not give him warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2016). We affirm.

*Background Facts*

In April 2012, Appellant lived in Mineral Wells with his girlfriend, his mother, and his two children, J.B.L. and J.L. J.B.L., the victim in this case, was twenty-one months old. J.L. was three years old. The children lived primarily with Appellant and would occasionally visit their mother, Karrieana Jennings.

On the morning of April 18, 2012, Appellant was home alone with the children. Between 10:30 a.m. and 10:40 a.m., Appellant arrived at the Palo Pinto General Hospital (PPGH) emergency room, carrying J.B.L. on his hip. J.B.L. was limp and covered in blood and vomit. A nurse immediately took J.B.L. to a trauma room. J.B.L. was unresponsive, was barely breathing, and was showing signs of severe brain injury. J.B.L. had bruising and redness on the right side of his forehead.

A CT scan of J.B.L.'s brain revealed massive bleeding that the medical professionals described as a subdural hematoma. J.B.L. also suffered from a right-to-left midline shift, meaning that his brain had begun to swell and shift within his skull. The staff at PPGH decided to transfer J.B.L. to Cook Children's Medical Center in Fort Worth. At Cook, Dr. Johnnie Honeycutt performed brain surgery on J.B.L. and removed the subdural hematoma. However, J.B.L.'s condition did not improve. On June 27, J.B.L. was transferred to hospice care. J.B.L. passed away on July 7.

When initially questioned by a nurse at PPGH, Appellant stated that, approximately ten minutes prior to arriving at the hospital, J.B.L. had fallen over the side of the railing of his bed. Appellant then stated that he tried to feed J.B.L.

2

pancakes but that J.B.L. vomited, so Appellant brought him to the hospital. The staff at PPGH did not believe that this version of events was consistent with J.B.L.'s injuries. Consequently, a PPGH nurse called law enforcement.

Mineral Wells Police Officer Kody Acuff arrived at PPGH and questioned Appellant. Appellant told Officer Acuff that he was in his bedroom watching television when he heard a loud noise. Appellant ran into his children's bedroom, where he saw J.B.L. lying unconscious on the floor.

Mineral Wells Police Detective Darby Thomas questioned Appellant's three-year-old child, J.L. During this interview, J.L. told Detective Thomas that he witnessed J.B.L. fall off the bed. The next day, April 19, the Child Advocacy Center in Fort Worth conducted a second interview of J.L. During this interview, J.L. again stated that J.B.L. fell off the bed. J.L. also indicated that J.B.L. had gotten in trouble.

On May 3, Lieutenant Matt Mull from the Texas Department of Public Safety Criminal Investigations Division interviewed Appellant. During this interview, Appellant told Lieutenant Mull that he grabbed J.B.L. by the arm and spanked him harder than he ever had before and that J.B.L. was "shaking around and drawing back and forth." J.B.L. then went limp in Appellant's arms. Appellant placed J.B.L. on J.B.L.'s bed and got him some water. Appellant denied hitting J.B.L. in the head. Appellant was arrested immediately after the interview.

While law enforcement was investigating the cause of J.B.L.'s injuries, Child Protective Services (CPS) was conducting its own investigation. Jennifer Gibson, a special investigator for CPS, described it as a joint investigation with the Mineral Wells Police Department (MWPD) that had "parallel paths." The primary goal of the CPS investigation was to ensure the safety of the children, which necessarily involved figuring out who caused J.B.L.'s injuries. During the law enforcement investigation, Detective Thomas allowed Gibson to observe interviews of family members and discussed with Gibson the nature of J.B.L.'s injuries. After Appellant

was arrested, Detective Thomas told Gibson that Appellant had "confessed," and had been arrested, and that she was free to interview him.

On May 9, Gibson interviewed Appellant in jail. Gibson did not give Appellant *Miranda* warnings and did not follow the procedure set out in Article 38.22 of the Texas Code of Criminal Procedure. During his interview with Gibson, Appellant stated that, on the morning of April 18, he was home alone with his two children. The three of them ate breakfast, and then Appellant put the children in their room to play. Appellant went to his room to watch television and rest. The children started jumping on furniture, and Appellant kept telling them to stop. Appellant disciplined J.B.L. by picking him up by his left arm and spanking him on his back and buttocks. Appellant told Gibson that he was "very forceful" and that J.B.L.'s head moved "back and forth" while he was spanking him. Appellant then slung J.B.L. into a chair and left the room to calm down. About twenty minutes later, Appellant heard a "thud" in the children's room. Appellant went back into their room and found J.B.L. lying unresponsive on the floor in front of the chair. Appellant placed J.B.L. onto the bed and wiped J.B.L.'s face with a wet cloth. J.B.L. began to vomit and appeared to have a seizure. Appellant then took J.B.L. to the hospital.

Appellant was initially indicted for injury to a child in June 2012. On July 31, 2012, after J.B.L. passed away, Appellant was indicted for capital murder. This indictment alleged that Appellant struck J.B.L. with his hands and/or shook J.B.L. with his hands. Almost two years later, on March 18, 2014, Appellant was indicted for a third time. The third indictment included two additional paragraphs alleging that Appellant struck J.B.L. with an unknown object and/or struck J.B.L. against an unknown object. Between April 7, 2014, and March 2, 2015, trial was set for five different dates. On all five dates, the trial was continued.

4

On March 13, 2015, J.L. was interviewed for a third time. During this interview, J.L. stated that Appellant, whom J.L. referred to as "bad daddy" and a "monster," struck J.B.L. with a wooden object. J.L. described the object as a colorful pillow that was made out of wood instead of fluff. J.L. further stated that Appellant kept this object near his bed and often used it to punish the children. No object matching this description was ever found in Appellant's home. Less than one month after this interview, on April 6, 2015, the case went to trial. Appellant had been incarcerated for thirty-five months as of the date of trial.

Dr. Jayme Coffman was the director of the child abuse program at Cook and one of the doctors who treated J.B.L. According to Dr. Coffman, J.B.L.'s injuries were not consistent with a blow to the head. Rather, J.B.L.'s injuries were caused by a "rotational force." This type of force could not have been caused by J.B.L. falling to the floor. However, J.B.L.'s injuries were consistent with the "severe hitting that caused him to flail about and make his head move" that was described by Appellant in his statements to Lieutenant Mull and Gibson.

*Analysis*

In his first issue, Appellant contends that he received ineffective assistance of counsel at trial. Appellant asserts that trial counsel was ineffective by failing to utilize a medical expert to help develop the defense's theories of the case. Appellant asserts that there were three defensive theories: (1) that J.B.L. had suffered a previously unknown head injury that made J.B.L. more likely to be injured again; (2) that J.B.L.'s injury was the result of an accidental fall; and (3) that J.B.L. was recovering from his injuries and was prematurely transferred to hospice care. Appellant contends that trial counsel rendered ineffective assistance by failing to call an expert witness to further develop these defensive theories.

In order to establish that trial counsel rendered ineffective assistance at trial, Appellant must show that counsel's representation fell below an objective standard

5

of reasonableness and that there is a reasonable probability that the result would have been different but for counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

"[A]ny allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Under normal circumstances, the record on direct appeal is generally undeveloped and rarely sufficient to overcome the presumption that trial counsel rendered effective assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). The Court of Criminal Appeals has said that "trial counsel should ordinarily be afforded an opportunity to explain [her] actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). If trial counsel did not have an opportunity to explain her actions, we will not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Appellant did not allege in his motion for new trial that trial counsel rendered ineffective assistance, and the trial court did not receive any evidence supporting Appellant's ineffective assistance claim. Accordingly, the

appellate record does not contain an explanation from trial counsel concerning her actions at trial or her trial strategy.

The decision to call a witness is generally a matter of trial strategy. *Joseph v. State*, 367 S.W.3d 741, 744 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd); *see also Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) ("The decision whether to call a witness is clearly trial strategy and, as such, is a prerogative of trial counsel."). Trial counsel asked for, and was granted, funds to hire an expert. We cannot determine whether the decision not to call this expert as a witness was a matter of trial strategy because the record does not contain any explanation of trial counsel's decision. When the record is silent as to the reasoning behind an alleged deficiency by trial counsel, "we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

Trial counsel cross-examined the State's medical experts regarding the possibility that J.B.L. suffered a previous head injury and the possibility that J.B.L. may have recovered from his injuries had he not been transferred to hospice care. During Appellant's case-in-chief, trial counsel called two doctors as fact witnesses. The first witness was the radiologist who read J.B.L.'s CT scan at PPGH. He testified that it was impossible to tell from the CT scans whether the injury was the result of an accident or non-accidental trauma. The second witness was the PPGH emergency room doctor who initially treated J.B.L. He testified that, based on what he saw, it was possible that the bleeding was from a previous head injury. Thus, trial counsel undertook efforts to develop the defensive theories, and she called doctors in an effort to provide medical testimony challenging the State's allegations. In the absence of evidence of trial counsel's trial strategy, the record does not affirmatively demonstrate that trial counsel's decision to not call additional expert witnesses was so outrageous that no competent attorney would have engaged in it. *See*

7

*Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Accordingly, Appellant has not satisfied the first prong under *Strickland*. We overrule Appellant's first issue.

In his second issue, Appellant contends that the trial court erred in failing to grant Appellant's Motion to Dismiss for Failure to Afford Speedy Trial. The Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI; *see also Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014). Courts determine a speedy trial claim on an "ad hoc basis" by analyzing and weighing four factors: (1) the length of the delay, (2) the State's reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *Gonzales*, 435 S.W.3d at 808.

The State has the burden to justify the length of the delay, while the defendant has the burden to prove he asserted his right and is prejudiced. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). The defendant's burden on the latter two factors "varies inversely" with the State's degree of culpability for the delay. *Id.* (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). When conducting the balancing test, no single factor is determinative, and the conduct of both the prosecutor and the defendant must be weighed. *Barker*, 407 U.S. at 530, 533; *State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999).

To trigger a speedy trial analysis, the defendant must make an initial showing that "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Gonzales*, 435 S.W.3d at 808 (quoting *Doggett v. United States*, 505 U.S. 647, 651–52 (1992)). If the defendant makes a threshold showing of presumptive prejudice, the court must consider and

8

weigh each of the remaining *Barker* factors. *Id.* (citing *Munoz*, 991 S.W.2d at 821–22).

If the right to a speedy trial has been violated, the remedy is dismissal of the charging instrument with prejudice. *Cantu*, 253 S.W.3d at 281. Because this is an extreme remedy, "courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id.* "The constitutional right is that of a speedy trial, not dismissal of the charges." *Id.*

When reviewing the trial court's ruling on a speedy trial claim, we apply a bifurcated standard of review. *See Gonzales*, 435 S.W.3d at 808. Because the State prevailed in the trial court, we presume the trial judge resolved any disputed fact issues in the State's favor, and we defer to the implied findings of fact that the record supports. *Cantu*, 253 S.W.3d at 282 (citing *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002)). We review legal questions de novo to determine whether there was sufficient presumptive prejudice to proceed to a *Barker* analysis and the weighing of the *Barker* factors. *Gonzales*, 435 S.W.3d at 809. We must uphold the trial court's ruling if it is supported by the record and is correct under the applicable law. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003).

We note at the outset that there is a disagreement concerning the length of the delay in this case. The State contends that the length of the delay should be calculated from March 18, 2014, the date that Appellant was indicted for the third time. However, Appellant was arrested on May 3, 2012, and has been incarcerated ever since. We disagree with the State's contention. "The delay in speedy trial claims is measured from the time the defendant is formally accused or arrested." *Floyd v. State*, 959 S.W.2d 706, 710 (Tex. App.—Fort Worth 1998, no pet.). The fact that Appellant was reindicted does not affect the calculation of the length of the

9

delay. *See id.* Therefore, the length of the delay in this case is approximately thirty-five months. This multiple-year delay was presumptively prejudicial and weighs against the State. *See Cantu*, 253 S.W.3d at 281 (citing *Doggett*, 505 U.S. at 652 n.1). Accordingly, we must proceed with an analysis of the remaining *Barker* factors.

The next factor considers the reasons for the delay. *Barker* assigns different weights to different reasons to justify the delay. *Barker*, 407 U.S. at 531. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Id.* However, a more neutral reason should be weighted less heavily, but is still considered against the State since the ultimate responsibility for a speedy trial rests with the State. *Id.* "Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

The State contends that the delay was due to the unavailability of a medical witness and to the discovery of evidence that the State was required to turn over to Appellant under *Brady v. Maryland*, 373 U.S. 83 (1963). At the hearing on Appellant's Motion to Dismiss for Failure to Afford Speedy Trial, the prosecuting attorney testified that this case had trial dates set in April 2014, May 2014, July 2014, February 2015, and March 2015 before the final trial date of April 6, 2015. The prosecuting attorney explained that the February 2015 and March 2015 trial dates were continued because he discovered that the video of J.L.'s April 19, 2012 interview was not in his possession and had not been turned over to Appellant. He instructed his investigator, as well as the MWPD officers, to search for the video and delayed the trial until it could be found. The prosecutor believed that this evidence was exculpatory and that he was required to disclose it to Appellant under *Brady*.

The State also explained that one of the trial settings was continued because of the unavailability of a medical witness, although the prosecutor could not remember which trial setting was continued for this reason. In addition, the

prosecutor explained that he wanted to clear the docket by setting other cases for trial first because he anticipated that this case would take a lot of time. Crowded dockets and lack of public resources for the criminal justice system do not justify a delay. *See Santibanez v. State*, 717 S.W.2d 326, 330–31 (Tex. Crim. App. 1986).

Detective Thomas testified at trial that he misplaced the video of J.L.'s interview. Negligence on the part of the State does not justify a delay. *Phillips v. State*, 650 S.W.2d 396, 400 (Tex. Crim. App. [Panel Op.] 1983). Any delay that can be attributed to these reasons are, therefore, neutral and weigh against the State, although not heavily. The unavailability of a witness does justify a delay. *Barker*, 407 U.S. at 531. However, it is unclear how much of the delay in this case can be attributed to the missing witness because the prosecutor did not remember which trial setting was continued for this reason. Nonetheless, to the extent that the delay can be attributed to the missing witness, it weighs in favor of the State.

Regarding the third *Barker* factor, the defendant bears the responsibility to assert his right to a speedy trial. *Cantu*, 253 S.W.3d at 282. Whether and how a defendant chooses to assert his right "is closely related to the other three factors because the strength of his efforts will be shaped by them." *Id.* at 282–83. A defendant's failure to timely seek a speedy trial does not amount to a waiver of the right. *Shaw*, 117 S.W.3d at 890 (citing *Barker*, 407 U.S. at 532). However, a defendant's failure to timely demand a speedy trial makes it difficult for the defendant to prevail on a speedy trial claim because the failure to timely demand a speedy trial indicates strongly that he did not really want a speedy trial and was not prejudiced by not having one. *Id.*; *see also Barker*, 407 U.S. at 536 ("[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates . . . that the defendant did not want a speedy trial."); *Harris v. State*, 827 S.W.2d 949, 957 (Tex. Crim. App. 1992) ("[A]ppellant's lack of a timely demand for a speedy trial indicates

11

strongly that he did not really want a speedy trial."). The longer the delay becomes, the more heavily a defendant's inaction weighs against him. *Shaw*, 117 S.W.3d at 890. A request that the trial court dismiss the charges for a speedy trial violation, rather than a request for a prompt trial setting, weakens the strength of a speedy trial claim because it indicates a desire to avoid trial rather than to obtain a speedy trial. *Phillips*, 650 S.W.2d at 401; *Orosco v. State*, 827 S.W.2d 575, 577 (Tex. App.—Fort Worth 1992, pet. ref'd).

Appellant first asserted his speedy trial right when he filed his Motion to Dismiss for Failure to Afford Speedy Trial on January 23, 2015, thirty-two months after he was arrested. Appellant contends that the reason he did not invoke his speedy trial right sooner was because "the State was repetitively resetting the case and Appellant always thought he was about to go to trial." Generally, when a defendant raises his speedy trial claim in a motion to dismiss, this is evidence that he did not really want a trial, and his speedy trial claim is weakened. *See Phillips*, 650 S.W.2d at 401. However, other evidence that a defendant wanted a speedy trial can be persuasive. *See Zamorano*, 84 S.W.3d at 651 n.40 (defendant filed a motion to dismiss rather than a motion for speedy trial, but asked for a speedy trial at the hearing).

There is no evidence that Appellant made any effort to assert his speedy trial right. On the contrary, there is evidence that Appellant was not ready for trial before April 6, 2015. On January 23, 2015, Appellant filed his Motion to Allow Ex Parte Presentation of Defense Requests for Expert Assistance, the same day he filed his Motion to Dismiss. On March 18, 2015, and again on March 24, 2015, Appellant filed Motions for Extension of Time to Disclose Experts. Thus, it appears that Appellant did not request funds to hire an expert until a little over two months prior to trial and that Appellant was unsure about whether or not to designate his expert until less than a month before trial. Further, Appellant was still filing pretrial

12

motions after trial had begun. *See Clarke v. State*, 928 S.W.2d 709, 714 (Tex. App.—Fort Worth 1996, pet. ref'd) (the fact that the defendant filed thirty-two motions on the same day that he filed his speedy trial claim was evidence that he was not ready for trial). Therefore, this factor weighs heavily against finding a speedy trial violation because Appellant's actions demonstrated only the desire to avoid a trial and obtain a dismissal rather than to obtain a speedy trial. *See Barringer v. State*, 399 S.W.3d 593, 601–02 (Tex. App.—Eastland 2013, no pet.).

The last *Barker* factor to consider is prejudice to the defendant. "Because 'pretrial delay is often both inevitable and wholly justifiable,'" this factor "examines whether and to what extent the delay has prejudiced the defendant." *Cantu*, 253 S.W.3d at 285 (quoting *Doggett*, 505 U.S. at 656). The prejudice must be assessed in light of the interests that the speedy trial right is meant to protect: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Id.*; *see also Barker*, 407 U.S. at 532. Of these three interests, the possibility that the defense will be impaired by dimming memories and the loss of exculpatory evidence is the most serious "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532; *see also Doggett*, 505 U.S. at 654; *Gonzales*, 435 S.W.3d at 812.

On March 13, 2015, less than one month before trial, a forensic interview of J.L. was conducted. J.L. was six years old. During this interview, J.L. described how Appellant beat J.B.L. with a wooden object. These statements are in sharp contrast to his initial statements in April 2012 that J.B.L. was injured when he fell off his bed. A witness's fading or changing memory can constitute prejudice. *Barker*, 407 U.S. at 534. However, "*Barker* requires a defendant to show that 'lapses of memory' are in some way 'significant to the outcome' of the case." *Munoz*, 991 S.W.2d at 829 (quoting *Barker*, U.S. 407 at 534). Here, there was no evidence to

13

corroborate the version of events related by J.L. in March 2015. In fact, Dr. Coffman testified that J.B.L.'s injuries were not caused by an external blow to the head. Therefore, it is unlikely that J.L.'s changed memory contributed significantly to Appellant's conviction.

Moreover, on two different occasions, Appellant admitted to spanking J.B.L. so hard that his head shook back and forth. Appellant's statements to Lieutenant Mull and Gibson are consistent with J.B.L.'s injuries. *See Thomas v. State*, 530 S.W.2d 834, 836 (Tex. Crim. App. 1975) ("The strength of the State's case, and the uncontested confession of appellant, precludes any showing that he was prejudiced [by the delay]."). Accordingly, this factor weighs against finding a violation of Appellant's right to a speedy trial.

Weighing in favor of finding a violation of Appellant's right to a speedy trial are the length of the delay and the neutral reasons for the delay by the State. However, the factors weighing against Appellant are the facts that Appellant failed to assert his right for thirty-two months and that he failed to demonstrate prejudice. We hold that the weight of the four factors, balanced together, is against finding a violation of Appellant's right to a speedy trial. *See Barker*, 407 U.S. at 534; *Shaw*, 117 S.W.3d at 891. Thus, the trial court did not err when it denied Appellant's Motion to Dismiss for Failure to Afford Speedy Trial. We overrule Appellant's second issue.

In his third issue, Appellant contends that the trial court abused its discretion by denying his motion to suppress his statements to Gibson because they were taken in violation of *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure. We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Leming v. State*, 493 S.W.3d 552, 563 (Tex. Crim. App. 2016). In reviewing a ruling on a motion to suppress, we apply a bifurcated standard of review. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Martinez v. State*, 348 S.W.3d 919,

922–23 (Tex. Crim. App. 2011). We afford almost total deference to the trial court's determination of historical facts and of mixed questions of law and fact that turn on the weight or credibility of the evidence. *Brodnex*, 485 S.W.3d at 436; *Martinez*, 348 S.W.3d at 922–23. We review de novo the trial court's determination of pure questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Brodnex*, 485 S.W.3d at 437; *Martinez*, 348 S.W.3d at 923.

The requirements of *Miranda* and Article 38.22 must be complied with in any custodial interrogation by law enforcement officers or their agents. *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). "[O]nly when a CPS investigator (or other non-law enforcement state agent) is acting in tandem with police to investigate and gather evidence for a criminal prosecution are such warnings required." *Id.* at 523. "Although state employment clearly makes a person an 'agent of the State,' that label does not, by itself, make the person an 'agent of the State' for the purpose of defining 'custodial interrogation.'" *Id.* at 528. The person alleging the agency relationship has the burden of proving it. *Id.* at 529.

In order to determine if a CPS investigator is acting as an agent of the State, the Court of Criminal Appeals in *Wilkerson* looked at the relationship between law enforcement and the CPS investigator, the interviewer's actions and perceptions, and the defendant's perceptions of the encounter. *Id.* at 530–31. According to the court, the essential inquiry is: "Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee?" *Id.* at 531. As noted by the court in *Wilkerson*:

> For the most part, CPS caseworkers, who are investigating family placement and safety matters, and police officers, who are investigating criminal matters, run on separate parallel paths. Both are interested in gathering information. While police are collecting

15

information for an arrest and criminal prosecution, CPS workers are investigating to find safe housing and protection for abused or neglected children. When a state-agency employee is working on a path parallel to, yet separate from, the police, *Miranda* warnings are not required.

*Id.* at 529.

Gibson testified that the primary purpose of her investigation was to ensure the safety of the children and to pursue placement options for them. Gibson stated that she was not conducting a criminal investigation. Gibson and Detective Thomas exchanged some information about the case. Detective Thomas allowed Gibson to observe interviews between law enforcement and J.B.L.'s family, and the two discussed the nature of J.B.L.'s injuries. Detective Thomas gave Gibson a "very brief" summary of Appellant's interview with Lieutenant Mull and informed her that Appellant had been arrested. Although Gibson obtained permission from Detective Thomas before interviewing Appellant in jail, it was Gibson, not Detective Thomas, who made the arrangements for the interview. Gibson denied receiving any instruction or direction from Detective Thomas regarding what questions to ask Appellant.

We conclude that Gibson was not an agent of law enforcement and was, therefore, not required to comply with *Miranda* or Article 38.22. The relationship between CPS and MWPD in this case was limited to Gibson and Detective Thomas sharing information regarding the contents of interviews and the condition of J.B.L. Further, Appellant has offered no evidence that either Gibson or Appellant believed that Gibson was acting under the direction of MWPD or gathering evidence for the purpose of a criminal investigation. Therefore, we cannot say that the trial court abused its discretion in overruling Appellant's motion to suppress his statements to Gibson. We overrule Appellant's third issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

JUSTICE


April 28, 2017

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.